# SUPPLEMENT.

## SHEPAUG VOTING TRUST CASES.

Superior Court, Fairfield County, October Term, 1890, before ROBINSON, J.

A syndicate purchased a majority of the capital stock of the Shepaug Railroad Company, which was placed in a voting trust to continue for five years, or until a consolidation was effected with some other railroad company, or it should be dissolved by agreement. A trust company was to act as trustee, and was to take the title and issue certificates to the members of the syndicate of the shares in it held by each, and was to vote on the stock as directed by a committee of the syndicate. The apparent object of the arrangement was simply to extend the railroad to tide-water and form a connection there with a certain other road, but there was a secret purpose to make a profit for themselves out of the construction contracts which they as directors of the railroad company would be able to make. After they had purchased the majority of the stock they made themselves directors and officers of the road and one of their number its president. The syndicate made $S$, one of their number, their financial agent, and, it being necessary to borrow money to pay for the stock purchased, had a large portion of the trust certificates issued directly to him and they were pledged by him in raising the money. They were by their terms transferable and had powers of attorney printed upon them which were signed in blank by $S$. Before the connection at tide-water could be effected $S$ failed and went

into insolvency. The loans were not paid and the pledged certificates were sold at public sale and most of them were bought by the plaintiffs. The certificates thus bought covered 7000 shares of the capital stock. The plaintiffs also purchased 3300 shares of the stock which had not gone into the trust, making their entire holdings 85 per cent of the whole capital. After the plaintiffs had acquired these trust certificates and this stock they notified the trust company that they revoked the powers given by the trust agreement and demanded that the stock represented by the certificates should be transferred to them upon a surrender of the trust certificates, but the trust company refused to make the transfer. Held:—

1. That the trust agreement was void as in violation of the duties of the directors of the railroad company, and against the policy of our law.
2. That the plaintiffs had the right to revoke the powers given to the trust company by the trust agreement, and to have transferred to them, on surrender of the trust certificates, as many shares of the stock as the certificates represented.
3. That the trust certificates were quasi negotiable.
4. That if the plaintiffs bought the trust certificates for the purpose of getting control of the railroad company, that fact alone did not constitute a reason for refusing the relief sought.
5. That although the members of the syndicate became partners in the project which they undertook, yet the trust certificates were individual and not partnership property, and the stock which they represented was not subject to partnership claims, or to an accounting between the plaintiffs and other certificate holders.

After the syndicate had acquired the control of the Shepaug Company, the directors caused two contracts to be entered into by the company, one with *R* to build an extension of the road to the state line and thence to a point in the state of New York, a railroad corporation of that state becoming a joint party with the Shepaug Company in the contract. The other contract was a ninety-nine years traffic contract with the New York company. Under the first contract a large amount of first mortgage bonds of the Shepaug company, issued for the purpose, was to be used to build the extension. A statute (Acts of 1889, ch. 166) provided that railroad companies might build branch roads provided they were found by a judge of the Superior Court, upon application and a hearing, to be of public convenience and necessity. No such finding had been obtained in this case. Held:—

1. That the contract with *R* was on its face illegal, being a contract to aid in building the road of another corporation in another state.
2. That the Shepaug Company had no authority to build the branch to the state line, there having been no finding by a judge of its being of common convenience and necessity.
3. That the contract was also void as being part of a fraudulent scheme.
4. That the traffic contract, being in aid of the fraudulent scheme, was void so far as the Shepaug Company was concerned.
5. That the plaintiffs' application to have these contracts set aside was not an

improper interference, on their part as stockholders, with the internal affairs of the company.

6. That the fact that the trust company and the committee of the syndicate voted in favor of the construction of the extension of the road and of the issue of bonds for the cost of it, did not estop the holders of the trust certificates from setting up the illegality of the proceeding.

7. That one of the plaintiffs who was a director and voted at a directors' meeting in favor of the *R* contract, was not necessarily estopped, as a certificate holder or stockholder, from setting up its illegality; as it was a contract that ought not to be upheld, there was, under the facts, a *locus penitentiæ* which the court ought to allow him.

8. That a vote of the directors after the suit was brought, with a written agreement of *R*, putting a construction upon the terms of the *R* contract that would avoid its illegal operation, and agreeing that it should not be so used, could not affect the case.

It is provided by Gen. Statutes, § 1927, that "no person shall vote at any meeting of the stockholders of any bank or railroad company, by virtue of any power of attorney not executed within one year next preceding such meeting, and no such power shall be used at more than one annual meeting of such corporation." The power given by the trust agreement to the trust company to vote upon the stock of the syndicate, had been given more than a year before the vote upon the *R* contract, and had been used at one annual meeting. Held that the power thus given was equivalent to a power of attorney, and that under the policy of our law, as declared by the statute mentioned, this power could not be legally given for five years or for an indefinite period.

Certain members of the syndicate, who were made defendants, set up as a part of their defense that the stock represented by the trust certificates was held by them as partners, and claimed that there was a defect of parties because all the partners had not been brought in. Held that as this was no part of the plaintiffs' case they were not bound to bring them in, but it was for the defendants, whose case created the necessity, to bring them in if they desired to have them made parties.

It is the policy of our law that an untrammeled power to vote shall be incident to the ownership of stock in a corporation, and a contract by which the real owner's power is hampered by a provision that he shall vote as some one else dictates, is entitled to no favor.

This is not entirely for the protection of the stockholder himself, but to compel a compliance with the duty which each stockholder owes his fellow stockholders, to use his vote for the general interest.

Two suits in equity, brought by William H. Starbuck and others against the Mercantile Trust Company and others, and by Jabez A. Bostwick and others against George D. Chapman and others, (the defendants being with a few exceptions the same in both cases,) to the Superior Court

in Fairfield County, and heard before *Robinson, J.* The cases involved the same general facts and were tried together. The following facts were found by the court.

The Shepaug, Litchfield & Northern Railroad Company was chartered by the legislature of this state in the year 1887.* Under this charter, the bond-holders of the Shepaug Valley Railroad Company were permitted to organize this new corporation with the rights, powers and franchises of the last named company; and from that year to the present time the Shepaug Company have owned a railroad running from Litchfield to Hawleyville in this state. There is at the latter place a connection with both the Housatonic and the New York & New England railroads. The whole number of shares of the capital stock of the Shepaug Company is 12,000.

In March, 1889, George D. Chapman, one of the defendants, and certain persons whom he associated with himself in the enterprise, conceived the idea of obtaining control of a majority of the capital stock of the Shepaug Company, and, under such control, of extending the Shepaug road to a connection, at tide water, with the New York, New Haven & Hartford Railroad at Saugatuck in this state. Their real purpose in obtaining this control, and the real ends which they had in view and desired to attain thereby, were the above mentioned extension of the Shepaug road, and the building of other branches for the Shepaug Company, and the making of a profit for themselves out of the construction contracts therefor, which, in that position of control, they might dictate or cause to be entered into with the Shepaug Company. These profits were not to be shared with other stockholders, but to go to Chapman and his associates exclusively. To carry out this purpose Chapman and his associates formed a syndicate, under a partnership agree-

---

* To save space the names of corporations and parties that are frequently repeated are abbreviated:—The Shepaug, Litchfield & Northern Railroad Company is called the Shepaug Company; the Mercantile Trust Company, the Trust Company; and George K. Sistare & Sons, the Sistares. Other abbreviations will be understood without explanation.

ment, the terms of which were that the partners should furnish what money was necessary to purchase 6100 shares of the stock of the Shepaug Company for $200,000, and 5900 other shares of the same stock, if required, at the rate of $20 per share ; and also to furnish what money should be necessary to make such extension and to build other branches ; and, further, that the 6100 shares should be placed in a voting trust, to last till a consolidation of the Shepaug Company with some other railroad company, or for five years, unless sooner terminated by unanimous consent of all the parties holding trust certificates issued by the trustee ; and that the profits to accrue from the building of the proposed extension and branches should go to this partnership, to be shared *pro rata* according to their contribution to this partnership fund.

The members of this partnership were George D. Chapman, Marcus W. Robinson, Richard S. Barnes, the firm of George K. Sistare's Sons, the Central Construction Company, Robert Dunlap, Robert L. Read, and Silas H. Witherbee, now deceased. Chapman was to furnish one fourth of the funds necessary, the Sistares one half, which they subsequently divided equally with one W. B. Howard, and Barnes, Dunlap, Read, and Witherbee, were together to furnish the remaining one fourth. The Central Construction Company were to furnish money, but what proportion did not appear ; but, from the dealings of Chapman with that company and his relation to it, his and its interest and share, and his and its obligations to the syndicate in the matter of furnishing funds, if not identical, were united. Chapman's son, Lucian T. Chapman, was the president of the Construction Company, and his wife owned the majority of the stock.

To obtain this control, Chapman and his associates, in that name, subsequently entered into a contract with one Edwin McNeill, then president of the Shepaug Company and one of its large stockholders, to purchase 6100 shares of the stock of the company and to pay therefor the sum of $200,000 ; and by a subsequent agreement contracted with McNeill to purchase 5900 other shares at $20 per share.

The 6100 shares of stock so to be purchased it was agreed should be placed in the hands of the Mercantile Trust Company, and the $200,000 was to be paid in different sums and at different times to the trust company to the credit of Mc-Neill. McNeill was not the owner of all this stock, but the shares were to be obtained by him from the several owners.

The 6100 shares of stock were delivered as agreed, and paid for out of funds furnished by the members of the syndicate; and 2435 other shares were purchased by the syndicate and paid for out of funds furnished by them. All these shares were delivered to the trust company, and all of them were subsequently transferred to the trust company, under a trust agreement which Chapman and his associates selected as the instrument by which to carry out the object of their partnership agreement. This trust agreement is dated April 26th, 1889, and is known in these cases as "Exhibit A." The parties to this agreement were Chapman and his associates, in that name, party of the first part; the Mercantile Trust Company, of the second part; and Harold Clemens, Marcus W. Robinson, and Lucian T. Chapman, "the committee," party of the third part.

These 8535 shares of the stock of the Shepaug Company still stand in the name and remain in the possession of the trust company. Said Barnes obtained from some source, and turned over to the trust company for syndicate purposes, the additional number of 66 shares; so that the whole number of shares of this stock that went into the trust was 8601.

Chapman was the managing partner of the syndicate, and so acted with their knowledge and consent, and by their consent directed its policy and business. The Sistares (who were then a firm of bankers in New York city) were selected by this syndicate as its financial agents to raise funds for syndicate purposes when necessary. It became necessary to raise such funds; and the syndicate did, through the Sistares, in fact raise the larger portion of the money needed to purchase the control of the Shepaug Company and to meet the other purposes and objects of the syndicate. And

accordingly Chapman and his associates from time to time directed the trust company to issue trust certificates to the Sistares as called for in the trust agreement, until there had been issued to them an amount representing 7785 shares of the stock. Out of this lot, trust certificates representing 900 shares were subsequently exchanged for trust certificates in favor of the Construction Company; and other trust certificates, representing 700 shares of the stock, were also issued to the Construction Company; all by a like direction of Chapman and his associates. Trust certificates were thus issued by the Trust Company upon all but 116 shares of the stock placed in the trust. $100,000 worth of the trust certificates issued as aforesaid to the Sistares belonged to them absolutely; and the balance of the number issued to them they were authorized by Chapman and his associates to pledge. W. B. Howard, who subsequently took one half of the Sistares' interest in the syndicate, owned absolutely the trust certificates that were issued to him out of the portion issued to the Sistares.

Almost immediately after this syndicate had obtained a controlling interest in the stock of the Shepaug Company, they took the direction of the affairs of the company. Through this voting trust a majority of the directors were taken from the members of the syndicate. Chapman was made the president, and Clemens the vice-president of the Shepaug Company. W. Z. Brown, the treasurer of the Construction Company, was made the secretary of the Shepaug Company.

On the 8th of April, 1890, the Sistares failed, and made an assignment in insolvency to one H. J. Davison. They had pledged for syndicate purposes, from time to time, some of the trust certificates issued to them. Both they and the syndicate were unable to redeem them, and they were sold at public auction to meet the loans for which they were pledged. These certificates were in different lots and to different banks and banking institutions. A portion of the trust certificates which some of the plaintiffs now hold, came in this manner through the Sistares. The Howard trust

certificates, representing 3350 shares, came directly to the plaintiff Bostwick from Howard; and no objection is made by the defendants to the title of these.

The Construction Company still holds a portion of the trust certificates issued to them. A portion of those formerly issued to that company, to wit, an amount representing 800 shares, has been transferred to one of the plaintiffs, George F. Cummings, for J. A. Bostwick. These were also pledged for a loan which was not met at maturity, and the certificates were sold, and were bought by Cummings. Chapman also holds trust certificates representing 400 shares of the Shepaug stock, which he bought at an auction sale. These also had been pledged by the Construction Company to secure some loan for the syndicate purposes. These trust certificates Chapman has pledged for a loan to himself. The plaintiffs are the owners now of trust certificates representing 7000 shares of the stock of the Shepaug Company, and owners of 3300 shares of the capital stock which never went into the trust. The greater portion of the plaintiffs' purchases of trust certificates and shares of stock were made between June 6th and 17th, 1890. The latest purchase was made by Bostwick August 7th, 1890. This was the purchase of the Howard trust certificates heretofore referred to.

I find that the plaintiffs knew of the trust agreement, and its terms as they appeared on the face of it. They also knew the terms of the trust certificates when they purchased them. But none of the plaintiffs knew of the terms of this partnership, or knew that such terms entered into and secretly formed a part of the trust agreement, as they in fact did. Between the members of this syndicate the terms of the partnership agreement were treated as a part of the trust agreement. The plaintiffs took the title to these trust certificates for value, and without knowledge or notice of any right or interest of this syndicate or its individual members therein, and without notice or knowledge of any such right or interest in the shares of stock represented thereby. They took them without notice of any infirmity growing out of the Sistares' manner of dealing with such certificates, and

without notice that they held the title to them in any sense as trustees, or that they had violated any terms of any trust that they were held under by them. The Sistares had dealt with these trust certificates precisely as they were directed to do by Chapman and his associates; and the latter were entirely cognizant of their manner of dealing with them and assented to it.

Dunlap, one of the syndicate, is not made a party to these proceedings by either the plaintiffs or the defendants. Witherbee, another of the syndicate, died June 8th, 1889. His executor qualified in the state of New York, but has never qualified in this state. The Sistares are not made parties; neither has Davison, their assignee in insolvency, been cited in. Clemens, one of these defendants, was one of the partners of the Sistare firm.

The plaintiffs made no application to the corporation itself or to the board of directors of the Shepaug Company for redress of the grievances complained of in these suits. It would not have been reasonable to require them to do so, or to require them to ask for action in conformity with their wishes touching the Ripley contract and the traffic contract hereinafter referred to, within the corporation itself or through the directors. Both were in the hands and control of this voting trust, and under the control of this syndicate, in whose interest and at whose instigation the acts complained of had been done. Any application for redress, either to the corporation or to the board of directors, under these circumstances, would have been useless.

I do not find that any of the plaintiffs have been guilty of any misconduct in the matter of the purchase of the trust certificates or of the stock. Neither has it been established that the real object of their purchase of these securities, or of the bringing of these suits, was to serve the interests of a rival railroad company or companies, or for any improper or meddlesome purpose.

The plaintiffs are strangers to this partnership and this partnership agreement. No account of the partnership has ever been taken, and no balance of profits and losses has

been struck. The voting trust was executed April 26th, 1889, and the voting power therein was used at the annual meeting of the stockholders in November, 1889, and it is proposed to use it at another annual meeting.

Some time in 1889 it was decided by the syndicate and the directors of the Shepaug Company, to abandon the project of the extension to Saugatuck mentioned in the trust agreement, as too costly, and therefore impracticable.

On the 15th of March, 1890, the plan of a different extension was taken up by the syndicate and the directors. This plan contemplated an extension to tide-water at Portchester, to connect with the N. York, N. Haven & Hartford Railroad; and on the date last named the Construction Company entered into a contract with a corporation known as the New York & Ridgefield Railroad Company, to build a railroad from some point at or near Danbury in this state, to Portchester in the state of New York. This company was in the hands of the syndicate and under its control, so that this contract was made. They had obtained its rights in some way by the promise of the payment of money, which was subsequently furnished and paid by the check of the Sistares. The plan of the syndicate was eventually to bring the Shepaug road down to Danbury by a branch, and to connect with this New York & Ridgefield Railroad.

The terms of this contract have never been carried out by the Construction Company, and the contract is forfeited; but there is a parol understanding that it may be resumed if the Construction Company hereafter desires to build the railroad under its terms.

On the 10th of April, 1890, at a meeting of the stockholders of the Shepaug Company, a vote was passed authorizing the issue of $300,000 of bonds to be secured by a mortgage upon its railroad property and franchise. It was further voted that the bonds or any part of them, or the proceeds of the sale thereof, be used for the purpose of building such branches as the directors might deem expedient to be built, and for acquiring such additional connections as in the opinion of the directors would increase the business and earnings of the com-

pany, and generally to provide such further and additional facilities as in the opinion of the directors would enable the company better to fulfil the purposes of its incorporation; and that the executive committee of the directors be authorized and empowered to sell the bonds, or any of them, and turn over the proceeds of the sale into the treasury of the company for the above purposes. This vote was preceded by a preamble, which recited that it was proposed that the company should borrow not exceeding $300,000, and secure the repayment of the same by its bonds, not exceeding the amount so borrowed, and secure the bonds by a mortgage of its property, for the purpose of constructing branches, providing for its outstanding obligations, and other lawful purposes.

At the same meeting another vote was passed, instructing the executive committee to take into consideration the construction of a branch line from a connection with the line of this company at or near New Preston station, to Lake Wauramaug, in the town of Washington; and to proceed with the construction of it when they deemed it for the interest of the company. And another vote, instructing the same committee to take into consideration the construction of a branch line from a connection with the line of the company's railroad at or near Hawleyville station to the city of Danbury, and to proceed with the construction of the same when it might be deemed for the interest of the company.

Neither of these is the branch in dispute in this case, except so far as a branch from Hawleyville to Danbury might be included in the one proposed from Hawleyville to the state line. The building of the disputed branch has not otherwise been acted upon by the stockholders of the Shepaug Company. No application has ever been made to a judge of the Superior Court for authority to build the branch from Hawleyville to the state line, and no such judge has found such branch to be of public necessity and convenience. The $300,000 of bonds referred to in the above vote were subsequently issued, and are now in the hands of Chapman, or under his control.

On the 21st of August, 1890, a meeting of the directors was held at Litchfield, at which there were present Chapman, Robinson, Barnes, Clemens, E. I. Chapman and Brown. Notice of the meeting, as required by the by-laws, was not given, and some of the directors, not receiving notice, were not present.

At this directors' meeting of August 21st, 1890, the directors passed a vote authorizing and directing the officers of the company forthwith to execute and deliver the contracts known in these cases as the Ripley construction contract, and the Croton Valley traffic contract. This scheme had its birth but a few days prior to the execution and delivery of the contracts representing it. The parties to the Ripley contract were the Shepaug Company, the Croton Valley Railroad Company, and John D. Ripley. The parties to the traffic contract were the two railroad companies. The Croton Valley Company has no railroad, and is a New York corporation, and began its corporate existence some time in 1885. It proposed to build a railroad from the Hudson River to the Connecticut state line at a point about two miles from Ridgefield. It has but little property, and but a small amount has ever been paid in on its capital stock, and there is nothing that leads the court to conclude that any more will be paid in.

The Ripley contract provides that Ripley shall build a railroad from Hawleyville to a point two miles beyond Ridgefield at our state line, and thence to Croton Point in the state of New York. The Shepaug Company and the Croton Valley Company agree therein to pay Ripley for such work, in their bonds or cash, upon such terms as in the contracts respectively appear. The sum of $35,000 out of the Shepaug bonds, the Ripley contract provides shall go to George D. Chapman, agreeably to a vote passed by the directors at the same meeting of August 21st, 1890.

The trust agreement, so far as Chapman and his associates and the committee are concerned, originated in and had as its prominent factors, secret and improper objects, terms and purposes, which continued down to and entered into

the making of this Ripley contract and this traffic contract. Both of these contracts, and any claimed modifications of the Ripley contract, were entered into to carry out such objects and terms and to serve purposes of private and personal profit and advantage to Chapman and his associates and the committee, and not to profit the other stockholders of the Shepaug Company. These contracts are injurious and oppressive to the company and its stockholders, and were entered into by the directors and officers of the Shepaug Company with full knowledge that they were of that character, and would embarrass the company, the shareholders and the trust certificate holders, and injuriously affect their rights and interests in the railroad property.

If the Shepaug Company are obliged to carry out this Ripley contract, it will require further bonding of the road, and seriously impair the financial condition of the company, and leave its stock of little value.

The traffic contract is to run ninety-nine years by its terms, and, if carried out, will necessitate the building of the branch from Hawleyville to the state line, a distance of eighteen miles, at an estimated cost of $1,200,000.

In authorizing these contracts and in executing and delivering them, there was, on the part of the directors, and Chapman, the president of the Shepaug Company, a disregard of the interests of the company and its stockholders. It was an attempt on their part to carry out a plan to hold the property and available securities and assets of the company under their control, that Chapman might obtain this $35,000 of the company's property, and that their own individual purposes might be served, and it was not done for the common good of the company and its shareholders.

Chapman neither expended money for, nor incurred liabilities in behalf of the Shepaug Company, to the amount of $35,000. No part of this sum was justly chargeable to the company. If he expended any such sum of money or incurred liabilities to that amount in the manner he claimed, such money was expended and such liabilities incurred in behalf of the Construction Company, and the syndicate of

which he was the head and manager. The directors, when they authorized the execution of the Ripley contract, and authorized the payment to Chapman of this $35,000, had knowledge that it was for no debt of the Shepaug Company.

On the 13th of September, 1890, after proceedings had been commenced in the Bostwick case, the directors of the Shepaug Company held a meeting, at which they passed a resolution which in substance declared that it is not the intent of the Ripley contract that any of the bonds of the Shepaug Company should be used to build any portion of the railroad of the Croton Valley Company. Ripley signed a memorandum assenting to this interpretation. The Croton Valley Company does not appear to have taken any similar action. This vote and memorandum were to affect the pending suit. Alexander McNeil was present at this latter meeting. The minutes of the preceding meeting of August 21st, were not read or approved. No action was taken touching the traffic contract, and there is no evidence that any mention was made of it at the meeting.

The plaintiffs have notified the Trust Company that they revoked their powers under the trust agreement. On September 2d, 1890, the plaintiff Bostwick notified Ripley that the construction contract which he had entered into, so far as the Shepaug Company was concerned, was illegal. On September 12th, 1890, the plaintiffs Starbuck and Bostwick tendered and offered to surrender to the Trust Company the trust certificates held by them, and made a demand for an equal number of shares of the stock of the Shepaug Company. The Trust Company declined to transfer such stock to them.

The Trust Company is justly entitled to $1,720.20 as compensation and for disbursements by it in the matter of the execution of the trust.

*S. E. Baldwin* and *C. C. Beaman*, for the plaintiffs.

*G. Stoddard*, for the Mercantile Trust Company.

*C. H. Blair* and *C. C. Keeler*, for intervening defendants.

*C. A. Seward, H. Stoddard, C. C. Higgins* and *W. B. Glover*, for the other defendants.

ROBINSON, J. Upon the facts found by the court it is claimed, in the Bostwick case, that an injunction ought to issue to restrain any further action to confirm, ratify, or carry out the Ripley contract, and to restrain the use or delivery of the $300,000 of bonds of the Shepaug Company under or in furtherance of this contract, or in any manner not authorized by the company's charter; and further, that an order should issue that the bonds be delivered up to the treasurer of the Shepaug Company; and that an order or decree declaring the Ripley contract unauthorized, illegal and void as respects the Shepaug Company, should be issued. And in the supplemental complaint in the Bostwick case, it is asked that a decree be entered, declaring the traffic contract for ninety-nine years void, and setting it aside; and a removal of the directors of the Shepaug Company is also asked for.

This Ripley contract, the court has found, had in it corrupt elements. It was in part consummation of, and to carry out, the illegal terms of the partnership agreement between George D. Chapman and his associates. The appropriation by it, and by the vote authorizing it, of $35,000 to Chapman was a fraud on the company and its stockholders, and furnishes, as it seems to the court, sufficient reasons for its interference, and the granting of the principal claims of the plaintiffs.

And further, it is an agreement on its face to use the bonds of the Shepaug Company, and those hereafter to be issued on the proposed extension from Hawleyville to the state line, to aid in building the line of another corporation.

But it is claimed by the defendants that the directors of the Shepaug Company do not put this construction upon the contract; and that they have said so by a vote at the meeting of September 13th, 1890, after this suit was begun,

and further that the same shall not be so used, and that Ripley does not put this construction upon it and has said so by a written memorandum. It is insisted that this objection is therefore removed. It is not claimed that the Croton Valley Company, the other party to this contract, has given its assent to any such construction or modification.

The terms of the contract are plain and explicit. They give Ripley the right to the bonds of the Shepaug Company, and of the Croton Valley Company, for the building of the line of road, and of the whole of it. If this contract was one which it was not proper to make, and one which it was not intended to make, and one which must bear an interpretation which was not intended, and requires alteration to make it what it was intended, why should the court allow it to remain, and why should it be held to be the real contract of the parties and one that expresses the real intention of the parties to it?

The contract is there in all its original force and vigor of terms, without any modification on the face of it or appended to it, and as long as it is in existence in its present form and terms, the court must look at it as it is in fact. This vote was passed to affect the pending suit, and I cannot consent to turn these plaintiffs out of court because of this tardy interpretation, even though concurred in by Ripley.

But it is claimed by the defendants that, if this Ripley contract can be construed as appropriating bonds of the Shepaug Company to build the line of the Croton Valley Company, this furnishes no legal objection to the contract; and they refer the court to the case of *Nashua Railroad Company* v. *Lowell Railroad Company*, 136 U. S. R., 356.

This case, in my opinion, does not sustain the claim of the defendants. The suit was brought by the Nashua Railroad Company to compel the defendant company to an accounting under a contract for the management of the two roads by one; a contract that had been in existence and operated under for many years with success and profit to both corporations. The defendant corporation and the manager of the business under this contract, built at its own ex-

pense a depot in the city of Boston, and by the contract was to build it at its own expense. But after a lapse of time the increased and increasing business of the two corporations working together under this contract required, in order that they should hold this business and carry it on for the joint benefit of both contracting parties, the further outlay of a large sum of money in alterations in and about the depot in question. This money so expended was admitted to have been upon the exclusive property of the defendant, but it was voted by the directors of the plaintiff company that the interest of seven per cent on this outlay should be treated as a part of the operating expenses of the plaintiffs' and defendants' railways under the contract above mentioned.

The plaintiff company complained that by this vote and action a large amount of the net earnings was thus diverted from them, and claimed that their directors had no authority for the vote permitting it. The court in deciding this point says: "As a general rule we should not hesitate to say that the directors of the Nashua Company (the plaintiff) could not authorize, without the previous approval of its stockholders, the construction of a passenger station at a city in a state foreign to that in which it was created and to which its own road did not extend, or the payment of any portion of the cost of construction. Such expenditures would not be considered as falling within the ordinary scope of their powers." "But," the court says further, "the fact that the increased facilities provided at Boston were necessary to enable the joint management to retain its extended business, in which the Nashua Company (the plaintiff) was of course directly interested, changes the position of the directors of that company with reference to such expenditures and brings them within the general scope of the directors' powers." And the court accordingly refused the application of the plaintiff.

It will be observed that the facts in the above case are so different from the facts in this that it does not furnish support or authority for the defendants' position. As it seems

to the court the case supports the plaintiffs' claim far more than it does the defendants'.

But the defendants say that from the Ripley contract is now eliminated any right, authority or agreement that the Shepaug Company's money shall go to build any part of the Croton Valley line, and that the Shepaug bonds are now by the claimed modification to be used solely to build the branch of the Shepaug road from Hawleyville to the state line ; and that all objectionable features to the contract are thus removed. Is this so ?

That depends upon whether the company itself had at that time any authority to build this branch from Hawleyville to the state line. If they had not, then the contract should not stand. I am satisfied that the company had no such authority. The statute of 1889, which is made an amendment to the charter of every railroad company in this state, provides that " any railroad company in this state may build branches from its main line or from any of its leased lines, provided that the construction of such branch is found by a judge of the Superior Court, upon due application, after such reasonable public notice as such judge may order, to be of public necessity and convenience." It is not claimed that the provisions of this statute have been complied with. They are authorized to build only such branches as a judge of the Superior Court has decided to be of "public necessity and convenience." No judge has passed upon this question and no application has been made to any judge of the Superior Court for that purpose.

The company itself had no authority to build this branch, and the stockholders have never authorized or assumed to authorize the building of it.

But it is said that there was a vote of the stockholders of the Shepaug road, April 10th, 1890, which in effect authorized the directors to build such branches as they might deem expedient to be built, and to acquire such additional connections as in the opinion of the directors would increase the business and earnings of the company, and generally to provide such further and additional facilities as in the opinion

of the directors would enable the company better to fulfil the purposes of its incorporation; and the bonds to be issued were to be used for this purpose, by the terms of this vote. It is claimed that under the cover of this vote the directors were acting when they voted to build the branch in dispute. They say they were authorized by this vote to build this branch, so far as authority from the stockholders is needed. Let us see what the stockholders had in view at this time.

At this period a connection at tide-water at Portchester with the N. York, N. Haven & Hartford Railroad was the enterprise on hand, and in the month preceding this meeting the Construction Company, heretofore mentioned, had entered into the contract with the New York & Ridgefield Railroad Company to build a railroad from some point at or near Danbury to Portchester. This was the connection referred to in this vote; and the other resolutions passed at this same meeting show what branches the stockholders had in view and what was meant by the vote above referred to. In one of these resolutions it is the branch to Lake Wauramaug, and in the other the branch from Hawleyville station to the city of Danbury when the same might be deemed for the interest of the company, so that the only branches, or connections thus intended were by the New York & Ridgefield Railroad from Danbury to Portchester, the branch from Hawleyville to Danbury to connect with it, and the branch to Lake Wauramaug off at the north. Neither of these is the branch in dispute, or covers any part of it, with the exception of the branch to Danbury. The branch in dispute is to extend about nine miles beyond Danbury to the state line. The branch to Danbury is only a part of the distance from Hawleyville to the state line.

At the time of these resolutions the branch from Hawleyville to the state line had not been considered by the directors or the company. This scheme did not have its birth until several months after these votes had been passed, and, as before suggested, they were in fact passed with reference to altogether different branches.

But assuming that the language of these votes is broad

enough to cover and authorize any branch in whatever direction or over whatever route the directors might think it proper to build one; is this vote to be construed as authorizing the building of any branch not permitted by the charter of the company or some amendment thereof? Is it to be construed as authorizing the directors to build a branch in defiance of law, and one in effect forbidden by the act of 1889? Is it to be construed to authorize the building of anything but lawful branches, after lawful authority obtained from the appointed tribunal. I am of the opinion not.

The defendants say the law as it stood at the passage of these resolutions permitted them to build this disputed branch. I can find no law in existence at that time that authorized the railroad company to build any branch which had not first been found by a judge of the Superior Court, upon application and public notice, to be of public convenience and necessity. This branch, which it is proposed to build under this Ripley contract, is not of this character and is not so claimed by the defendants; and the court is of opinion that the company have no authority to build it.

Now should either the Ripley contract or the traffic contract be allowed to stand? It is found that the latter is a contract for ninety-nine years, with a corporation which has little real existence beyond its articles of association. It has no railroad, and the Shepaug Company's road is eighteen miles distant from the nearest point of the proposed road of the Croton Valley, and it has no present authority to build any connecting branch, if there were a railroad to connect with. It is found that this trust agreement, so far as Chapman and his associates are concerned, originated in and had as prominent factors secret and improper objects, terms and purposes, which continued down to and entered into the making of both the Ripley contract and the traffic contract. It is found that both these contracts were entered into to carry out such objects and terms and to serve purposes of personal profit and advantage to Chapman and associates and the committee. It is found that these contracts are oppressive and injurious to the Shepaug Company and its

shareholders, and were entered into by the directors and officers of the Shepaug Company with full knowledge that they were of that character, and would embarrass the company, its shareholders and the trust certificate holders, and injuriously affect their rights and interests in the railroad property. It is further found that if this Ripley contract were carried out it would seriously impair the financial condition of the Shepaug Company and leave its stock of little value. And there are other facts which I will not here repeat, that should have a controlling influence.

The court cannot give its countenance to contracts that are in fact oppressive and injurious to the company and its shareholders,—contracts to obtain a personal profit and gain to directors and officers, or in which there is a fraudulent appropriation of the funds of the company to its president, or contracts that are inspired by such an agreement as the facts show this trust and syndicate agreement to have been.

It is claimed by the defendants that the court should not entertain the plaintiffs' application because it is an application by the stockholders to the court to interfere with reference to domestic or internal affairs of the corporation, which they say cannot be done except under very peculiar circumstances and to a very limited extent.

I feel justified in saying with reference to this claim, that the facts disclose sufficiently peculiar circumstances to warrant the court in entertaining the application of the plaintiffs. In the case to which I am referred by the defendants for the doctrine of this claim, *Hawes* v. *Oakland*, 104 U. S. R., 453, the court says: " The exercise of this power (the power of the court of equity) in protecting the stockholders against the fraud of the governing body of directors or trustees, and in preventing their exercise in the name of the corporation of powers which are outside of their charter or articles of association, has been frequent, and is most beneficial, and is undisputed." And the court adds that perhaps the best assertion of the rule under discussion is found in the case of *MacDougall* v. *Gardiner*, 1 Ch. Div., 13, in which substantially the following language is held :—" Nothing connected

with internal disputes between shareholders is to be made the subject of a bill by some shareholder on behalf of himself or others, unless there be something *ultra vires* on the part of the company, *qua* company, or on the part of a majority of the company, so that they are not fit persons to determine it."

And the Supreme Court of the United States further suggests in this same case of *Hawes* v. *Oakland*, that the courts of this country, outside of the federal courts, have in numerous instances admitted the right of a stockholder to sue, in cases where the corporation is the proper party to bring suit, but that they limit this right to cases where the directors are guilty of fraud or a breach of trust, or are proceeding *ultra vires*. And on page 460 of the same case the court says:—" We understand the doctrine to be that to enable a stockholder in a corporation to sustain in a court of equity, in his own name, a suit founded on a right of action existing in the corporation itself, and in which the corporation itself is the appropriate plaintiff, there must exist, as a foundation of the suit, some action, or threatened action, of the managing board of directors or trustees of the corporation, which is beyond the authority conferred on them by their charter or other source of organization, or such a fraudulent transaction completed or contemplated by the acting managers in connection with some other party or among themselves or with other shareholders, as will result in a serious injury to the corporation or to the interests of the other shareholders; or where the board of directors or a majority of them are acting for their own interest in a manner destructive of the corporation itself or of the rights of the other shareholders, or where the majority of shareholders themselves are oppressively and illegally pursuing a course in the name of the corporation which is in violation of the rights of the other shareholders, and which can only be restrained by the aid of a court of equity." In my opinion the facts in the case we are considering bring it clearly within the rules thus laid down by the United States court.

It is claimed that Alexander McNeill, in the directors'

meeting of September 13th, 1890, assented to the Ripley contract by presence and vote, and therefore should not be allowed to set up its illegality as a stockholder or certificate holder. Assuming that he did assent to it, it is a contract which the court thinks ought to be set aside, and if he assented to it, at that place and time, there is under the facts a *locus penitentiæ* which the court will concede to him.

It is further suggested that the trustee and the committee named in the trust agreement voted in the affirmative for branches, and for the issue of $300,000 of bonds and the mortgage to secure them, and that this action inheres in the trust certificates into whosesoever hands they come, and that such holders are estopped from setting up the illegality of such action.

But this is not an application to set aside these bonds and that mortgage; neither is it an application to set aside some part of the vote of the meeting held April 10th, 1890, for that is the meeting to which the objection refers. On the contrary, it is an application to set aside certain contracts not at that time contemplated, by one of which contracts it is proposed to make an unjustifiable use of these bonds. It is further an application to compel the placing of these unused bonds in the hands of the treasurer of the corporation that issued them. It is an application to set aside the traffic contract and the Ripley contract, entered into many months after this vote, and not contemplated at the time of this vote by any one connected with the company; and it is only because the directors propose to use some of these bonds to carry out the Ripley contract in constructing an unauthorized branch or extension, and otherwise to improperly use the rest of them, that they take any place or perform any part in this application or in these proceedings. But there are other facts found that forbid giving force to this objection.

In view of the disposition which I make of other questions in this case I will pass over the one growing out of the lack of notice for the meeting of August 21st, 1890.

In the Bostwick case the court orders a permanent injunction to issue as prayed for. It further orders the $300,000

of bonds of the Shepaug Company to be delivered without delay into the hands of the treasurer of the Shepaug Company. The court decrees that the Ripley construction contract was unauthorized, illegal and void as respects the Shepaug Company, and that the traffic contract with the Croton Valley Railroad Company is also void, and therefore should be set aside.

In the Starbuck case the court is asked to decree a permanent injunction against the Mercantile Trust Company to restrain it from voting on the stock standing in its name, at any future meeting of the Shepaug Company, according to the direction of the committee named in the trust agreement, or in any way except as authorized by the true owners of the stock respectively; and a permanent injunction against the Shepaug Company, to restrain it from receiving any such votes. The court is also asked to issue an order that the Trust Company transfer to the plaintiffs respectively the stock, now standing in its name, which is equitably owned by the plaintiffs respectively. And there is also sought an injunction to restrain Harold Clemens, Marcus W. Robinson, and Lucian T. Chapman, the members of the committee, from attempting to perform any further acts under said contract and power of attorney.

In this case it is found that the plaintiffs have in fact revoked the voting power in the trust agreement; but the defendants claim that as a matter of law they cannot do this. The character of this trust, so far as the Trust Company is concerned, is a dry trust. The Trust Company has no beneficial interest whatever in the shares of stock which are made the subject of the trust. They have no interest in favor of which they can claim a continuance of the trust. Neither has the committee named in the trust any interest which they, as such committee, can set up for the continuance of the trust. This committee or a majority of them are made an attorney to determine how the Trust Company shall vote in matters coming up in stockholders' meetings. So I say this committee, as such, has no interest that it can set up for a continuance of the trust. It has no benefi-

cial interest in the subject matter of the trust, and in fact no powers, duties or functions in the trust other than above stated.

But it is said that this voting trust is to run five years, and that during the five years the voting power is not revocable except by unanimous consent of all holders of trust certificates. Can this be insisted upon against the demands of these trust certificate holders? Cannot these certificate holders revoke this voting power, notwithstanding this provision in the trust agreement?

The court in the case of *Griffith* v. *Jewett et al.*, 15 Weekly Law Bulletin, 419, recently held the following language in a case similar in some respects to this one:—"If such demand be not complied with, the party holding the entire beneficial interest in the stock cannot cast the vote thereof, while it may be voted upon by one having no interest in it or in the company; and so it may come to pass that the ownership of a majority of the stock of a company may be vested in one set of persons, and the control of the company irrevocably vested in others. It seems clear that such a state of affairs would be intolerable, and is not contemplated by the law, the universal policy of which is that the control of stock companies shall be and remain with the owners of the stock. The right to vote is an incident of the ownership of stock, and cannot exist apart from it. The owners of these trust certificates are, in our opinion, the equitable owners of the shares of stock which they represent, and being such, the incidental right to vote upon the stock necessarily pertains to them. They may permit the trustees, as holders of the legal title, to vote in their stead if they choose; but when they elect to exercise the power themselves, the law will not permit the trustees to refuse it to them."

The propriety and soundness of the doctrine of this case, and the necessity of its application, can have no better or more forcible illustration than in the facts and situation of the matter before us. The plaintiffs own 10,300 shares of the stock of this Shepaug road or its equivalent, and, if the

contention of the defendants be sound, are shut out for several years from any voice in the election of officers and in the policy and management of the corporation.

If I follow the doctrine of this case, as I feel compelled to, the conclusion must be that these plaintiffs, in the absence of any other well grounded objection, have the right to revoke the voting power in this agreement.

But it is said that the case of *Griffith* v. *Jewett* differs from this, in that the power in the former case was irrevocable, while in this it is to last for a term of years only, and, being such, is not against the policy of the law.

It seems to the court that the surrender by a stockholder of his power and right to vote on his stock for the term of five years is contrary to the policy of the law of this state. Were this a power of attorney in formal terms, no claim would be made but that it was not only contrary to the policy of the law of this state, but in direct conflict with our statute, which says that " no person shall vote at any meeting of the stockholders of any bank or railroad company, by virtue of any power of attorney not executed within one year next preceding such meeting ; and no such power shall be used at more than one annual meeting of such corporation." Gen. Statutes, § 1927. This statute tends to disclose what the policy of the law of this state is, touching the matter of the surrender by a stockholder of his voting power to some one else. It would seem that it is opposed to such surrender for an 'indefinite period or for a period of five years. Evidently it was thought a longer surrender of the voting power would result disastrously in many ways.

It cannot be denied that as much disaster might follow to the business and the finances of a corporation and the interest of stockholders, where the voting power is yielded up in a five years voting trust, as by a five years power of attorney. The difference between an irrevocable power and a power irrevocable for five years, is a difference in degree and not in principle. A five year voting power, irrevocable for that time, would furnish time enough and opportunity

enough to realize all the evils which our one year statute is manifestly intended to guard against.

It is the policy of our law that an untrammeled power to vote shall be incident to the ownership of the stock, and a contract by which the real owner's power is hampered by a provision therein that he shall vote just as somebody else dictates, is objectionable. I think it against the policy of our law for a stockholder to contract that his stock shall be voted just as some one who has no beneficial interest or title in or to the stock directs; saving to himself simply the title, the right to dividends, and perhaps the right to cast the vote directed, willing or unwilling, whether it be for his interest, for the interest of other stockholders, or for the interest of the corporation, or otherwise. This I conceive to be against the policy of the law, whether the power so to vote be for five years or for all time. It is the policy of our law that ownership of stock shall control the property and the management of the corporation, and this cannot be accomplished, and this good policy is defeated, if stockholders are permitted to surrender all their discretion and will, in the important matter of voting, and suffer themselves to be mere passive instruments in the hands of some agent who has no interest in the stock, equitable or legal, and no interest in the general prosperity of the corporation.

And this is not entirely for the protection of the stockholder himself, but to compel a compliance with the duty which each stockholder owes his fellow-stockholder, to so use such power and means as the law and his ownership of stock give him, that the general interest of stockholders shall be protected, and the general welfare of the corporation sustained, and its business conducted by its agents, managers and officers, so far as may be, upon prudent and honest business principles, and with just as little temptation to and opportunity for fraud, and the seeking of individual gains at the sacrifice of the general welfare, as is possible. This I take it is the duty that one stockholder in a corporation owes to his fellow-stockholder; and he cannot be allowed to disburden himself of it in this way. He may shirk it

perhaps by refusing to attend stockholders' meetings, or by declining to vote when called upon, but the law will not allow him to strip himself of the power to perform his duty. To this extent, at least, a stockholder stands in a fiduciary relation to his fellow-stockholders. For these reasons I hold that this trust agreement is void as against the policy of the law of this state.

And why is not the voting power surrendered in this trust agreement the equivalent of a power of attorney, and why has not the right of this Trust Company and this committee to control and cast the vote upon this stock, if at any time they had any legal right to exercise it, ceased to exist? It is now more than one year since the voting power was executed, and that power has been used already at one annual meeting. Why is not this voting power in this trust agreement, and the attempt of this trustee and this committee to exercise it now, a disobedience of our one year statute above quoted?

It is claimed that it is not a power of attorney because the Trust Company holds the legal title to the stock. It is said that the right to vote on the stock is not dissociated from the legal title to the stock in this instance. But does this reply quite answer the objections created by the facts in the case, and is it quite true that the voting power here is not dissociated from the legal title? An examination of the trust agreement discloses that the Trust Company is a mere agent, with no beneficial interest in the stock. It holds the title, but the real owner is somebody else. The Trust Company is simply the hand to cast such ballot as this committee directs. The committee is also but an agent, but without the legal title to the stock or any title to it. It is the head, and the Trust Company is the hand; simply that. The committee direct, control and select what vote shall be cast, and are the agents and attorneys to perform this very essential part of the act of voting.

The trust company is one of the parties to the trust agreement, and it holds the legal title to the stock, and as such holder of the legal title it has in this trust agreement

surrendered all a voter's power except the mere manual act of casting the selected ballot. It has in this trust agreement in effect surrendered to this committee the power to select the ballot. It has conceded to this committee the power to demand that it shall vote as they direct. What remains then in this trustee of the voting power, beyond being the mere hand, the use of which this committee is given the right to demand for this purpose at any stockholders' meeting? Is not the full voting power to all intents and purposes in this committee, and is it not so by delegation? It seems to me that the voting power in this trust agreement falls within the spirit and intent of the prohibition of our statute heretofore referred to, and is terminated by lapse of time and the use of it already at one annual meeting.

It is insisted that there is nothing illegal, *per se*, in the pooling of stock to carry out a scheme of extension authorized by law and favored by the corporation. This may be true under proper limitations, and when this is all there is to the scheme; but when underlying that pooling contract there is between the members of the syndicate, who are directors or a majority of the directors of the corporation, a secret agreement which enters into this pooling contract, and forms the object of its creation, and by which they are to take to themselves the profits arising from such extension, or from the contracts which they as directors make, elements of unfairness and opportunity for fraudulent and dishonest practices are introduced, which the court cannot too severely condemn. Such a pooling contract or voting trust is in violation of the most elementary principles of law governing the dealings of trustees with trust property and their *cestuis que trust.*

In the case of *Barnes* v. *Brown*, 80 N. York, 535, the court in commenting upon this subject said:—"It is true that the plaintiff while acting as a director of the corporation held a fiduciary relation to it. He was a trustee of the corporation and was under the same disability which attaches to all trustees in dealing with trust property and in transacting

the business pertaining to the trust. He could not act as trustee and for himself at the same time, and he would not be permitted to make a profit to himself in his dealings with the corporation. It is against public policy to allow persons occupying fiduciary relations to be placed in such positions as that there will be constant danger of a betrayal of trust by the vigorous operation of selfish motives." In the case of *Butts* v. *Wood*, 37 N. York, 318, the court uses this language:—" The rule that one holding a position of trust cannot use it to promote his individual interests, by buying, selling, or in any way disposing of the trust property, is now rigidly administered in every enlightened nation, and its usefulness and necessity become more apparent." But this doctrine is too well known and too universally recognized to require reference to further authority. It is fundamental, and by it must stand or fall all dealings of a director with the property of his corporation.

But the defendants claim that if there is a defect of parties, as the plaintiffs say there is, such defect must defeat the plaintiffs' suit. I do not think this claim can be sustained. The plaintiffs have not contended that there was an absence of any parties necessary to the determination of their right to revoke this voting power and to demand a transfer of the shares of stock represented by these trust certificates; but they set up in their pleadings that there is a defect of parties in the proceedings in the nature of a counter-claim instituted by certain intervenors, members of this syndicate, in which they claim a division of the shares of stock of the Shepaug Company now in the hands of the Trust Company.

It is true that certain members of the syndicate are not parties to this suit, but these persons could not be necessary to a determination of the plaintiffs' right to the relief sought, unless these shares of stock, represented by the plaintiffs' certificates, were claimed by the plaintiffs to be partnership property. But the plaintiffs make no such claim as this, but quite the contrary. It is the defendants who claim this by their intervention suit and counter-claim. It is for the

parties who set up the partnership title and interest as a basis for their claim for relief, to bring in all who are interested in the settlement of partnership matters and in a division of partnership assets. This the intervenors have not done.

But it is said that the purchaser of a trust certificate becomes a partner in the original partnership by express agreement in the trust certificate, and is therefore bound, not only to carry out the partnership agreement, but also, if the partnership is to be wound up, to bring all partners into court for a distribution of the assets. The principal factor in this claim is that the purchaser of one of these trust certificates becomes, by express agreement in the certificate, a partner in the original partnership. Neither the trust certificate nor the trust agreement contains any reference to any partnership or the terms of any partnership; neither contains any statement that any such partnership ever existed. This court cannot declare these plaintiffs parties to a partnership agreement, about which, or its terms, they never heard and never knew until they were disclosed on the trial. But it is insisted that in the trust agreement is placed the form of the trust certificate, which contains a clause which recites that the holder of the certificate, by accepting the certificate, duly assents to the trust agreement. Now it seems to the court that the most that can be claimed from this is, that the holder of the trust certificate assented to the terms of the trust agreement as they appeared on the face of it, and not to the underlying secret partnership agreement. The holder of each trust certificate, by the terms of the certificate, is to receive his dividends upon it, as for the number of shares of stock represented by his certificate; and upon the determination of the trust is to receive just as many shares of the capital stock as his trust certificate names. There is no hint that he may receive any less, or that an accounting of partnership matters may be required, or that his interest may be or is likely to be diminished, or that his shares of stock, as represented by the trust certificate, are to be subject to any obligation or losses

of any partnership. In short the trust certificate represents and is evidently intended to represent, each holder's separate and distinct number of shares of the stock put in trust. The trust certificates were individual property as soon as they were issued to an individual, and represented so much individual ownership of stock that was tied up in a voting trust, the ownership of which stock could be evidenced in no better or more satisfactory manner; and if the certificates were individual property and represented so much individual ownership of stock, this stock so represented was not partnership property, and the purchase of a trust certificate under these circumstances could have no effect to make the buyer a partner in a partnership whose terms and existence he was not apprised of. These plaintiffs, I am satisfied, are not partners in this syndicate, and the stock represented by their holdings of trust certificates is not subject to partnership claims or inquiry.

But the claim is made that the trust certificates are not negotiable, or even *quasi* negotiable; that they are only personal contracts upon which may be founded a claim for relief in equity; but that such right inheres in the personal contract, and not in the ownership of any stock in a corporation; and that this right cannot be enforced until all the parties to the contract and in interest are brought before the court.

Each of these trust certificates contains the language that "the holder hereof is entitled to receive at the office of said trust company his ratable share of any dividend paid upon the deposited stock, and upon the termination of the trusts under which said stock was deposited, the holder hereof will be entitled to receive from this company, upon surrender of this certificate, an equal number of shares of the capital stock of said railroad company. The interest of the holder hereof in the shares of stock represented by this certificate is assignable by transfer solely upon the books of the Mercantile Trust Company kept for that purpose, either by the holder hereof in person, or by his attorney, upon the sur-

render of this certificate." This form of certificate is made a part of the trust agreement.

The trust agreement contains this further provision, "that the party of the second part (the Trust Company) upon the termination of this agreement shall, upon the surrender of the certificates issued in pursuance of the trust agreement, transfer and assign to the registered holders presenting the same, certificates for the number of shares of stock deposited with it, that such registered holders may be respectively entitled to under the said trust certificates."

It will be seen that the certificates are to govern as to the number of shares which each holder is to be entitled to, and are made transferable ; and further that, if not negotiable in the strict sense of that term, they have a *quasi* negotiability similar to certificates of stock. And not only is the certificate made transferable, but the holder's interest in the stock represented by the certificate is made transferable upon the books upon surrender of the trust certificate.

When it is borne in mind that the persons who created this trust, and moulded it into this shape, and with these provisions for easy and expeditious transmission of the trust certificates from hand to hand and the holder's interest in the stock thereby represented, voluntarily parted with all such interests as are hereinbefore mentioned, it would seem that this claim of the defendants should not have much weight in a court of equity. It seems to the court that this objection is without any force or strength unless the defendants or the partnership have some interest in the stock represented by the trust certificates in the plaintiffs' hands, and unless there in fact existed some infirmity attaching to the trust certificates or the stock which would have defeated their use of them and their claim to the stock represented by them.

But the court has held that none of the defendants or this syndicate have any interest in these trust certificates or the shares of stock represented by them, and the facts show that no such infirmity existed. The court has found that George K. Sistare's Sons acted in the matter of pledging these cer-

tificates within the instructions given them by the syndicate.

But I cannot agree with the defendant's counsel that these trust certificates have not a *quasi* negotiability. Our court held in *Bridgeport Bank* v. *New York & New Haven Railroad Company*, 30 Conn., 231, that certificates of stock have a "species of negotiability, although of a peculiar character, but one necessary to the public convenience." Cook, in his recent work on " Trusts " of this modern character, says (page 9) :—" In all these (trusts) also trust certificates are issued by the trustee to the parties to represent their interest in the trust. These certificates are bought and sold on the market like shares of stock; " and (page 14 :—) " Certificates representing a proportional interest are issued. These certificates are transferable ; the persons interested in the trust change and fluctuate." I must hold that these trust certificates, subjected to such use by the consent of the syndicate as that they eventually were put afloat and came into the hands of these plaintiffs, who purchased them for value and without notice, have quite as much negotiability when endorsed with an irrevocable power of attorney to transfer, in blank, and signed by the owner, as certificates of stock under like circumstances. I think this is a fit case for the application of the doctrine of estoppel. Each trust certificate is a declaration put afloat through the instrumentality of this syndicate that the signer thereof holds in trust a definite number of shares of stock for the holder of the certificate. It is in effect a declaration that the holder owns the equitable title to a precise number of shares, and at the termination of the trust, on surrender of the certificate, will be entitled to have that number of shares transferred to him by the signer. This trust certificate or declaration is made assignable by agreement of the syndicate and by the terms of the certificate, and was sent out into the market through the instrumentality of this syndicate ; and now certain members of it attempt to impeach or burden the holders' title. This the court cannot permit.

But the defendants say that, even if the trust certificates

have a *quasi* negotiability, the defendants were bound to make inquiry. But not unless there was something about the *quasi*-negotiable collateral that ought to put a prudent person upon inquiry. The trust certificates and the trust agreement, and the other facts found, show nothing of this latter sort; and had these plaintiffs made inquiry, that inquiry would have revealed, if frankly answered, simply the facts found by this court.

It is suggested by the defendants that " he who comes into equity must come with clean hands." This is true; but the court fails to find any act or conduct upon the part of any of the plaintiffs that will entitle the defendants to the benefit of this rule. It is suggested that the plaintiffs bought into the Shepaug Company for improper purposes, and to interfere with a policy agreeable to all the stockholders, and to obtain a control, and to use this control for the benefit of rival railroad companies; and it is said that these suits are to that·end. But it has not been established that the real object of these suits is to serve the interests of rival companies, or that they have been brought for any improper or meddlesome purpose. That the plaintiffs intended to revoke the voting trust when they purchased the trust certificates is quite likely true; but there is no direct proof of it; and if there were, they had the right to do this; and so had any trust certificate holder the right at any time to revoke this voting trust. They had the right to purchase these trust certificates and these shares of stock which were offered for sale, and even if these acts of purchase give them the control of the Shepaug Company, and they purchased with that intent, these things can furnish no reason for a court of equity to refuse its assistance to protect their rights and procure a recognition of them by this trust company. Even if this is to result to the plaintiffs in the control of the Shepaug Company, this court cannot refuse its aid so far as sought in this case. It is not unlawful for persons to purchase or to own the majority of the stock of a corporation, and if these plaintiffs have bought and are entitled to the control, why should this court refuse to compel those in

control, and not entitled to it, to surrender it to those who are? If the plaintiffs have bought these trust certificates and this stock unhampered by any burdens, liens or rights of the defendants, it would seem intolerable that parties who own eighty-five per cent of the capital stock should be kept out of any voice in its policy or management, because it is feared that they may use, or intend to use, this control for the benefit of rival companies.

The court in the case of *Griffith v. Jewett*, heretofore referred to, very properly says:—" Moreover we are dealing with the rights of property, and it is no answer to one's demand for the possession and control of his own property to say that he intends to use it for an illegal purpose. * * * If the illegal proceedings feared by the defendants should be undertaken by any of the parties, the law will doubtless afford remedies and the court be ready to apply them."

Upon the facts the court cannot grant the prayer and claims of the intervenors. They have not brought all their parties before the court, and they are not in a position to ask it if they had; and it would involve the settlement of partnership accounts, which is in no wise necessary in ascertaining or determining the plaintiffs' rights to the relief they seek. The present condition of their partnership affairs is a matter of entire indifference to the plaintiffs' proceedings and rights.

I must sustain the demurrer to the prayer and claims of the intervenors; and on the merits of their complaint it has been found that they have neither any several nor any partnership interest or ownership in the trust certificates of stock claimed by the plaintiffs. The plaintiffs' demurrer to paragraph four of the defendants' fourth defense and counterclaim is sustained.

In the Starbuck case the court orders a permanent injunction to issue against the Mercantile Trust Company to restrain it from voting on the stock of the Shepaug Company, in its name, at any future meeting of said company, according to the direction of the committee named in the

trust agreement, or in any way except as authorized by the true owners of the stock respectively.

The court further orders a permanent injunction to issue against the Shepaug Company to restrain it from receiving any such vote.

The court orders that the trust company transfer to the plaintiffs respectively the stock now standing in its name, of said railroad company, which is equitably owned by the plaintiffs respectively and is represented by the trust certificates which the plaintiffs hold; but upon what terms, if any, such transfer shall be made, the court will determine after hearing the claims of the Mercantile Trust Company with reference to such matters.

The court also orders a permanent injunction to issue to restrain Harold Clemens, Marcus W. Robinson, and Lucian T. Chapman, the committee named in the trust agreement, from attempting to perform any further acts under said trust agreement and power of attorney.