White *v.* Thomas Inflatable Tire Co.

FRANK N. WHITE and GEORGE R BIDWELL

*v.*

THOMAS INFLATABLE TIRE COMPANY, H. W. SHEIBLEY, AMOS W. THOMAS and JOHN C. SULLIVAN.

1. The holder of certain patents agreed with seven capitalists to form a stock company, whose capital should be divided into one hundred thousand shares, of which fifty-five thousand should be issued to him in payment for his patents to be assigned to the company, and twenty-eight thousand should be issued to the seven capitalists for cash to be advanced and used in exploiting the patents, and the remaining seventeen thousand shares should be held in the treasury for sale.

2. They further agreed that all of the eighty-three thousand shares so to be issued, except enough to qualify directors, should be transferred to a trustee to hold for ten years, who should issue trust certificates to the holders, which should be assignable and transferable, and that the trustee should vote at elections of directors in such manner that the patentee should nominate and elect a minority of the directors, and the holders of the remainder of the stock should nominate and elect the majority.

3. This being done, complainants purchased of the company the seventeen thousand shares of treasury stock, and certificates were duly issued to them therefor. They also purchased from the patentee trust certificates for over fifty thousand shares, surrendered the same and had new trust certificates issued to them.—*Held*, that the trust agreement was void as against the complainants.

Bill for injunction and other relief. On final hearing on the pleadings and oral proofs.

At the hearing the following facts appeared :

At and prior to October 3d, 1890, the defendant Amos W. Thomas was the owner of divers letters-patent for the manufacture of inflatable tires for covering the wheels of road vehicles, and on that day entered into an agreement with seven residents of Philadelphia, two of whom were the defendants Sheibley and Sullivan, by which Thomas and his wife, who was interested with him in the patents, assigned and transferred them to Horn, one of the seven contracting parties, as trustee, to be held by

White *v.* Thomas Inflatable Tire Co.

him in trust for the benefit of all the parties, and subject to the directions of the other seven, including Thomas. The agreement provided that the parties should proceed to exploit the patents and attempt to make them profitable, and that all profits made should be divided among them in the following proportions, that is, fifty-five eighty-third parts to Thomas, and twenty-eight eighty-third parts to the seven subscribers. It was further provided that, if a majority of the subscribers should determine, a corporation should be formed for the purpose of carrying out the trust and the objects of the agreement, and the trustee should convey the patents to the corporation, and, in such case, Thomas should receive fifty-five per cent. of the stock of the corporation, and the other seven subscribers should receive twenty-eight per cent. of the stock, such issue of stock to be in payment to Thomas for his stock, and to the other seven subscribers for the amount of money which they by the agreement advanced or were to advance, and the remaining seventeen per cent. of the stock of the company should be retained in the treasury to be sold as and when determined by the board of directors. It was further provided that the directors and officers of the corporation for the first year should consist of all the parties to the agreement, and that John C. Sullivan should be president, Ellwood Horn, secretary and treasurer, and Amos W. Thomas, vice president,

" and for the mutual benefit of all concerned, all the parties hereto agree to put their stock into a voting trust for a period of ten years from the formation of said corporation. The trustee of said voting trust shall be hereafter chosen by mutual consent, and it shall be his duty to vote at all elections for directors of said company in such manner and for such persons as that *a minority of one in said board of directors shall consist of such persons as said Thomas shall wish to be directors, and a majority of one in said board of directors shall consist of such persons as the remaining stockholders shall wish to be directors.*"

On the 11th of October the seven subscribers to this agreement, not including Thomas, organized themselves into a corporation of the State of New Jersey, to be known and designated as the " Thomas Inflatable Tire Company," with a capital stock of $500,000, divided into one hundred thousand shares of the par value of $5 each, which, by the terms of the certificate, were

divided among them equally.    The object of the corporation was
stated to be

"to make, purchase and sell, manufacture articles of any and all descriptions,
especially bicycles and other vehicles; to acquire and dispose of rights to use
the same; to buy and sell patents and patent-rights, and to buy, sell and hold
the stocks or bonds of any corporations organized under the laws of any of the
United States."

This certificate was duly filed with the clerk of Camden
county on the 13th of October, 1890, and on the same day in
the secretary of state's office.

On the 22d of October, 1890, the same parties entered into a
further agreement by which they undertook to transfer all the
capital stock of the Thomas Inflatable Tire Company owned by
each of them,

"except such as may be necessary to qualify the board of directors, to H. W.
Sheibley, of Philadelphia, Pennsylvania, as trustee, in trust, to pay to each
of us the income, profits or dividends accruing to the shares so transferred by
us, to hold said shares in his own name as trustee."

This transfer was made, and Sheibley issued trust certificates
to each stockholder for the amount of his holding, in pursuance
of the last clause of the agreement of October 22d, 1890.    These
certificates were negotiable and transferable in the same manner
as the stock which they represented.

Under this agreement, eighty-three thousand shares of the
stock were issued, and all, except enough to qualify the directors,
were transferred to Sheibley as trustee.    Of the shares issued,
fifty-five thousand were issued to Thomas and four thousand
each to the other seven stockholders; seventeen thousand of the
one hundred thousand shares remained unissued and were called
"treasury stock."

In the month of June, 1892, the complainants applied to the
company to buy the seventeen thousand shares of unissued stock,
and at a meeting of the directors, who were the parties to the
voting-trust agreement, it was resolved to issue the same for a

White v. Thomas Inflatable Tire Co.

price then agreed upon.   The same were issued to complainant
Bidwell, except five shares issued to complainant White.

In  July,  1892,  Bidwell  purchased  of  Thomas  fifty-three
thousand of the trust certificate shares issued to him by Sheibley.
A portion of the balance of those issued to Thomas he had trans-
ferred to other parties, so that he had denuded himself of almost
all the trust certificates, but retained a few shares of stock stand-
ing in his name to qualify him to act as director.

The agreement giving the holders of the twenty-eight thousand
shares  the  control  of  the  company was  not  incorporated  in  any
by-law, nor does it appear upon the face of the certificates of
stock or of the trust certificates of stock issued.

The negotiation for the purchase of the seventeen thousand
shares of stock from the company was carried on by the com-
plainant White, and there was evidence tending to show that
before he made the purchase he had notice of the substance of
the trust-voting agreement, but this was denied by him.

The time fixed for the annual election of directors was early
in October, 1892, and on the 30th of September, 1892, this bill
was filed, setting out the agreements by which the stock was
issued in trust to Sheibley, alleging that the same were void as
against public policy, and were revoked by the sale by Thomas
of his trust certificates and the issuing of the seventeen thousand
shares of treasury stock to the complainant, and praying that the
defendant Sheibley might be restrained from voting at an election
of directors on any shares of stock held by him according to the
directions. of the defendant Thomas, and that Thomas be re-
strained from nominating directors to be voted for by Sheibley,
and that the trust contained in the agreements may be declared
to be terminated, the agreements canceled and set aside, and
Sheibley directed to transfer to the complainants the shares of
stock held by him represented by the trust certificates, and, in
the alternate, that complainants, instead of Thomas, may be
held entitled to nominate a minority of the directors to be voted
for by Sheibley.

On the filing of this bill an injunction was issued accordingly.
The Thomas Inflatable Tire Company, Sheibley and Sullivan

answered jointly, admitting the facts set up in the bill, and alleging that the contracts were valid and should be enforced, and further setting up that the complainants desire to get control of the company for an improper and unjustifiable purpose. The defendant Thomas answered by himself, setting up the same defence, and, by a cross-bill, setting up that the fifty-odd thousand shares of trust certificates were obtained from him by the complainant by fraud, and asking that the sale be set aside. The cause was brought to hearing on these pleadings. No proof was offered in behalf of this allegation of the cross-bill, or of improper motive on the part of complainants. The cause was heard upon the question of the validity of the trust-voting contracts as against the complainants.

*Messrs. Grey & Grey* and *Mr. Freedley* (of Philadelphia), for the complainants.

*Mr. Christopher A. Bergen*, for the defendant company.

*Mr. Howard Carrow*, for Thomas.

*Mr. E. O. Mitchenor* (of Philadelphia), for Sheibley and Sullivan.

PITNEY, V. C.

The complainants advance three propositions—*First.* That the original contract, by which a minority of stock was given the perpetual right to elect a majority of the directors, and thus control the affairs of the company, was contrary to public policy and, for that reason, void. *Second.* That, conceding the contract to be valid and binding between the original parties so long as only eighty-three per cent. of the stock was issued, it nevertheless became nugatory and void as against the holders of the seventeen per cent. of new stock as soon as that was issued. *Third.* That in any view of the case the holders of the majority of the fifty-odd thousand shares of trust certificates once issued to Thomas have the right to dictate to the trustee the names of

the four directors, which, by the agreements, were to be nominated by Thomas.

The last proposition was not seriously disputed by counsel for the defendant, as, indeed, I think it could not be. The agreements provided for trust certificates to be issued by the trustees, and they were made transferable on the books of the company by the trustee, and a provision was made for the issuing of new trust certificates in place of any assigned and surrendered. Trust certificates were issued accordingly, and of these, nearly all those issued to Thomas have come to complainants' hands, and with such possession and ownership, the right to nominate the directors. This point was directly ruled, after full discussion and consideration, in the cases of *Bostwick* v. *Chapman* and *Starbuck* v. *The Mercantile Trust Co.*, known as the "*Shepaug Voting Trust Cases*," reported in *60 Conn. 576*; see *pp. 580, 587; 24 Atl. Rep. 34* (at *pp. 39, 40*). There, as here, a large majority of the stock of a corporation was standing in the name of a trustee, in pursuance of an agreement entered into by the original owners of the stock, to the effect that the trustee should vote upon it as directed by three certain persons named. Trust certificates were issued, as here, which were negotiable, and a majority of them came into the hands of the complainants. Upon a bill filed in equity by them, the court enjoined the trustee from voting except as directed by the holders of the trust certificates, and also that the stock should be distributed by the trustee among the holders of the trust certificates.

In the course of its opinion the court uses this language, in which I fully concur:

"It is the policy of our law that an untrammeled power to vote shall be incident to the ownership of the stock, and a contract by which the real owner's power is hampered by a provision therein that he shall vote just as somebody else dictates, is objectionable. I think it against the policy of our law for a stockholder to contract that his stock shall be voted just as some one who has no beneficial interest or title in or to the stock, directs, saving to himself simply the title, the right to dividends, and perhaps the right to cast the vote directed, willing or

unwilling, whether it be for his interest, for the interest of other stockholders, or for the interest of the corporation or otherwise. This I conceive to be against the policy of the law, whether the power so to vote be for five years or for all time. *It is the policy of our law that ownership of stock shall control the property and the management of the corporation*, and this cannot be accomplished—and this good policy is defeated—if stockholders are permitted to surrender all their discretion and will in the important matter of voting, and suffer themselves to be mere passive instruments in the hands of some agent who has no interest in the stock, equitable or legal, and no interest in the general prosperity of the corporation.

"And this is not entirely for the protection of the stockholder himself, but to compel a compliance with the duty which each stockholder owes his fellow-stockholder, to so use such power and means as the law and his ownership of stock give him, that the general interest of stockholders shall be protected, and the general welfare of the corporation sustained, and its business conducted by its agents, managers and officers, so far as may be, upon prudent and honest business principles, and with just as little temptation to and opportunity for fraud, and the seeking of individual gains at the sacrifice of the general welfare, as is possible. This, I take it, is the duty that one stockholder in a corporation owes to his fellow-stockholder, and he cannot be allowed to disburden himself of it in this way. He may shirk it, perhaps, by refusing to attend stockholders' meetings or by declining to vote when called upon, but the law will not allow him to strip himself of the power to perform his duty. To this extent, at least, a stockholder stands in a fiduciary relation to his fellow-stockholders."

To the same effect is *Griffith* v. *Jewett, 15 Week. L. B. 419*, decided by the superior court of Cincinnati. There, as here, the holders of a majority of trust certificates, which, by the contract, were to be voted according to the directions of certain individuals, demanded of the trustee to vote as they should direct, and the court uses this language: "If such demand be not complied with, the party holding the entire beneficial interest in the stock

cannot cast the vote thereof, while it may be voted upon by one having no interest in it or in the company ; and so it may come to pass that the ownership of a majority of the stock of a company may be vested in one set of persons, and the control of the company irrevocably vested in others.   It seems clear that such a state of affairs would be intolerable, and is not contemplated by the law, *the universal policy of which is that the control of* *stock companies shall be and remain with the owners of the stock.* The right to vote is an incident of the ownership of stock and cannot exist apart from it.   The owners of these trust certificates are, in our opinion, the equitable owners of the shares of stock which they represent, and, being such, the incidental right to vote upon the stock necessarily pertains to them.   They may permit the trustees, as holders of the legal title, to vote in their stead if they choose, but when they elect to exercise the power themselves, the law will not permit the trustees to refuse it to them."

The general principle is thus stated by Mr. Beach in his treatise on *Corporations* § *306 :*

" On general principles the right to vote on stock cannot be separated from the ownership in such sense that the elective franchise shall be in one man and the entire beneficial interest in another, nor to any extent unless the circumstances take the case out of the general rule.   It matters not that the end is beneficial and the motive good, because it is not always possible to ascertain objects and motives, and if such a severance were permissible it might be abused."

And see what was said in *Cone* v. *Russell, 3 Dick. Ch. Rep.* *208* (at *pp. 212, 214*).

In the case in hand, the beneficial ownership is in the holders of the trust certificates, and the trustee must vote as they direct.

As to the two other positions above stated, the weakness of the first position lies in the fact that the voting trust was a part of the original contract between the original parties, and was made for a proper purpose and for a good consideration.   The consideration for it was the advancement of the cash by the seven promoters, and the substance of the agreement was that, while the seven should have the control of the management of

the enterprise, the owner of the patent should have the majority of the profits, in the proportion of fifty-five to twenty-eight. So long as each retained his original interest, and no other rights intervened, I see no difficulty in holding such contract valid and its enforcement proper and practicable. I see nothing in it contrary to public policy.

The difficulty and weakness of defendants' position in regard to it arises out of the machinery adopted by the parties to carry through their scheme. They organized a stock company with all its inherent characteristics, some of which have been stated above, and although they put the stock issued to each in the name of the trustee to hold in trust for them, they still issued trust certificates to each and made them assignable and transferable; and an inseparable incident of those certificates is that the trustee must vote as the *cestui que trust*, who is the real owner, shall direct.

Now to see how the scheme will work out in practice, let us suppose the seven promoters, or any of them, shall transfer their trust certificates, or any of them, to strangers, or shall disagree among themselves. · How shall the votes be cast, and for what candidates? Whose direction shall the trustee take? And this suggests a still further and greater difficulty, and it is this: How shall the trustee distinguish between the different trust certificates, after they have been once surrendered, and new certificates issued? How can he know what certificates shall represent the parties of the one part to the contract in question and which the party to the other part? How shall he choose from out of the different holders of trust certificates the proper persons to nominate the majority and those to nominate the minority of the directors? For it seems clear enough that new certificates, when issued, are freed in the hands of their holders from any burden in equity which attached to them in the hands of the former owner. If the answer to these questions results in the destruction of the ingenious scheme of these gentlemen, such result will be owing to their desire to adopt the machinery of a stock company and thereby avoid personal liability for their contracts. They must take the burdens with the benefits of such organization.

White v. Thomas Inflatable Tire Co.

But I do not find it necessary to answer these questions, or to determine whether the transfer of certificates in this case has gone so far as of itself to end the contest, since I have come to the conclusion that the second position taken by the complainants is sound. The contracts in question were not made a part of the certificate of organization or incorporated into the by-laws. Nor, in my judgment, did they, or could they, be fastened upon, or in anywise affect, the seventeen thousand shares of stock issued directly to the complainants. And I think this is so, whether the complainants had or had not notice of these contracts, since they did not enter into or form part of the contract between the company and the complainants as holders of the new stock. As such holders they were entitled to have the other shares of stock in the company stand upon an equal footing, and to have the affairs of the company managed by a board of directors elected according to law, by a majority of all the stockholders. Unless, as the holders of the new issue of stock, they had such right, they would be deprived of a valuable right belonging to their stock, viz., the right to combine with other stockholders to elect a majority of the directors. In fact, they would be deprived of all voice in the management of the company and of the right which each stockholder has to the benefit of the fundamental and salutary rule that the best interests of the minority are found in a rule by the majority. In my judgment, the issuing of this stock was a waiver and abandonment by the directors, who united in issuing it, of their rights under the contract in question.

The futility of the notice of these contracts alleged to have been given to complainants before they subscribed for the seventeen thousand shares of stock will appear when we consider the effect of a transfer of them to new parties. Such new parties would not be charged with such notice, and their rights would be undisputed. Should relief be denied the complainants in the present action it would be but a postponement of the time when this voting trust must end.

I will advise a decree for complainants.