NATIONAL LIBERTY INSURANCE COMPANY OF AMERICA, Plaintiff, *v.* THE BANK OF AMERICA and Others, Defendants.

GEORGE U. TOMPERS, Plaintiff, *v.* THE BANK OF AMERICA and Others, Defendants.

Supreme Court, New York County, March 9, 1926.

Corporations — voting trust agreement — agreement by which bank stock is to be transferred of record to voting trustees to be voted by them for ten years is voting trust and is in violation of Stock Corporation Law, § 50 (as amd. by Laws of 1925, chap. 120) — agreement giving unlimited discretion as to policy of bank is against public policy — plaintiff entitled to continuation of temporary injunction restraining voting of bank stock — agreement neither recites determined plan of action nor secures debt but gives voting trustees right to exercise all powers " as the absolute owners " of deposited stock — agreement void where substantial portion of stock was acquired subsequent to date when amendment to Stock Corporation Law, § 50, became effective — provision permitting transfer of stock to others than officers and directors violates Banking Law — equity will not treat agreement as genuine trust agreement nor designate trustee — determination herein properly made on motion.

An agreement which permits bank stock to be transferred of record to trustees to be voted by them for ten years and gives to said trustees unlimited discretion

as to the policy of the bank is a voting trust and as such is against the public policy of the State and violates section 50 of the Stock Corporation Law (as amd. by Laws of 1925, chap. 120), which eliminates banks from the scope of its provisions regulating the creation of voting trusts.

Accordingly, plaintiff, a stockholder of defendant bank, is entitled to the continuation of a temporary injunction restraining the individual defendants from voting, and the bank from permitting to be voted, stock held by said individual defendants as voting trustees under a voting trust agreement which neither recites a determined plan of action on behalf of the bank nor secures a debt, but rather requires the stockholders to give to the trustees, who include officers and directors of the bank and who hold a majority of the stock thereof, not only a voting power, but authority to consent to the merger or consolidation of the bank with any other institution upon any terms they deem fit, to accept in place of the shares deposited any shares in any amount to be issued in exchange therefor on 'merger, to consent to the dissolution of the bank, and gives the voting trustees the right to exercise all powers " as the absolute owners of the deposited stock."

Moreover the fact that a substantial portion of the stock was acquired subsequent to the date of taking effect of the amendment to section 50 of the Stock Corporation Law (Laws of 1925, chap. 120) which eliminated from the statute the right of banks to perfect voting trust agreements vitiates said agreement. When the Legislature withdrew banks from the provisions of the act permitting the creation of a voting trust, it necessarily terminated the valid existence of this agreement.

Irrespective of said amendment, the agreement is invalid for the reason that in authorizing the trustees to transfer a sufficient number of shares of stock to give any person the statutory qualification as a director, provided he is nominated by the trustees and agrees at the end of his term forthwith to return to the trustees the qualifying shares so held, purports to destroy the requirements of the Banking Law that a bank director must not only be a stockholder in his own name, but must make oath that he owns the stock in his own right in good faith.

Nor can the agreement be sustained by the substitution as voting trustees of alternates who are not bank directors or officers, for the reason that said alternates have not signed or become parties to the agreement and could become trustees only " in the event of the death, resignation, inability or refusal to act " of the named trustees.

The court will not treat the agreement as a genuine trust agreement and under general equity powers designate a trustee to effectuate its purposes, since said agreement is not a real trust agreement of the kind under which equity exercises such function, but is a mere voting trust agreement.

In the absence of a substantial question of fact, the determination of the questions herein were properly made on this motion rather than upon a trial.

MOTION by plaintiff to continue temporary injunction.

*Frank H. Stewart* and *Hirsch, Sherman & Limburg [Frank H. Stewart, Henry L. Sherman, Louis S. Posner* and *Walter H. Pollak* of counsel], for the plaintiffs.

*Rushmore, Bisbee & Stern [Henry Root Stern, James F. Sandefur, Bertram F. Shipman* and *Lloyd H. Landau* of counsel], for the defendants.

PROSKAUER, J.    Plaintiffs sue to restrain the individual defendants from voting and the corporate defendant (hereafter called the bank) from permitting to be voted stock of the bank held by the individual defendants as voting trustees under a voting trust agreement dated December 31, 1924.

The plaintiff National Liberty Insurance Company of America owns 2,500 shares of the bank's stock, valued at approximately $900,000.    The plaintiff Tompers holds voting trust certificates for 1,024 shares of such stock, worth approximately $350,000.    The bank is subject to the State Banking and Corporation Laws.    The individual defendants are, and were on December 31, 1924, respectively the president and director, the vice-president and director, and a director of the bank.    The voting trustees hold a majority of the stock of the bank.    A substantial portion of this they acquired subsequent to March 12, 1925, the date of an amendment to section 50 of the Stock Corporation Law of 1923 (as amd. by Laws of 1925, chap. 120), eliminating banks from the scope of its provisions, which regulate the creation of voting trusts.    The Attorney-General, as *amicus curiæ*, on behalf of the Banking Department, supports the motion.

By the agreement the stock is to be transferred of record to the trustees (or their nominee) to be voted by them for ten years; any stockholder may become a party.    It prescribes no course or policy for the voting trustees.    Accentuating their unlimited discretion, paragraph 16 provides that they may, but are not bound, to follow the demands of a majority of the certificate holders.

This is a voting trust agreement of bank stock with bank officers and directors as voting trustees.

The precise question is whether it is against the declared public policy of this State to permit stockholders of a bank, retaining all beneficial interest in their stock, to turn over the voting power, even by voting trust agreement, to officers and directors of the bank.

Banking is a business affected with a public interest.    (*Noble State Bank* v. *Haskell*, 219 U. S. 104; *Dillingham* v. *McLaughlin*, 264 id. 370.)    It has peculiar obligations and correlative peculiar restrictions upon its management.    Its directors are charged with serious responsibility.    They must take an oath of office as sacred as that of a public officer.    (Banking Law, § 124.)    They are required by section 131 of the Banking Law to make an independent audit of the affairs of the bank at least annually.    They cannot discharge this duty through their officers.    The responsibility is placed upon the directors *per se*.    Every one is required to own, and to make oath that he owns, beneficially " in good faith " and in his own

right, stock of the value of $1,000. Its stockholders are under double liability. (Banking Law, § 120.) For the public protection their legitimate self-interest to escape such double liability is invoked to cause them to choose directors who will faithfully discharge these important duties and exercise a check upon the officers. The statutory scheme is clear that there should be domination neither of directors by officers nor of stockholders by directors. To this end the Legislature enacted by section 26 of the General Corporation Law that "No officer, clerk, teller or bookkeeper of a corporation formed under or subject to the banking law shall act as proxy for any stockholder at any meeting of such corporation." Directors are embraced within the word "officer." (2 Opinions of Atty.-General [1912], 285; *Eastham* v. *York State Telephone Co.*, 86 App. Div. 562; *Torbett* v. *Eaton*, 49 Hun, 209; 113 N. Y. 623.)

Distinction is made in the authorities cited by defendants between certain aspects of a proxy and of a voting trust. They do not reach the heart of the matter. While, as pointed out in Cushing on Voting Trusts (p. 125), the proxy creates a temporary relation and the voting trust confers qualified title with an irrevocable authority, the statutory prohibition against proxies to bank officers is here significant to the extent that it is logically imported into the situation presented.

As is stated by McLAUGHLIN, J., in *Schley* v. *Andrews* (225 N. Y. 110, 114), while a statute may have "no direct bearing on the question being considered, it indicates by its enactment a legislative intent" which is to be considered in determining a public policy.

Issuance of a mere proxy of bank stock to bank officers for one meeting is forbidden. *A fortiori* irrevocable authority to bank officers to vote stock over a period of ten years under a naked trust must in reality transgress the legislative declaration of policy. Prior to the amendment of 1925 a voting trust of bank stock, if it did not name as voting trustees officers, directors or employees of the bank, might have been valid. No device could have been valid by which the voting right, disassociated from beneficial ownership of bank stock, should be lodged in its officers. Its stockholders, in response to the urge of legitimate self-interest, are called on to elect freely a board of directors that shall be neither dominated by officers nor self-perpetuating. If the officers and directors may control elections, the statutory independent audit by directors for the protection of stockholders and depositors becomes a futile gesture.

I do not (nor indeed do the plaintiffs) impute improper motive to those who created this agreement. The invalidity lies not in their motive, but in the device itself. It essentially lends itself to

improper conduct of a quasi-public institution. It is, therefore, against public policy irrespective of whether it has been improperly used.

This illegality taints the agreement whether or not it be regarded as created independently of the provisions of section 50 of the Stock Corporation Law of 1923, (as amd. by Laws of 1925, chap. 120). There is much contention on argument and in brief as to whether any voting trusts are valid *dehors* the statute. This question cannot receive categoric answer and need not for the purposes of this motion. The law has been admirably stated by two text writers, Mr. Marion Smith, of the Georgia Bar, in 22 Columbia Law Review (at p. 627), and Professor I. Maurice Wormser, of the New York Bar, in 18 Columbia Law Review (at p. 123). The former writes from a viewpoint antagonistic to the common-law validity of voting trusts, the latter from an opposite viewpoint. Their conclusions as to the case law, however, are in substantial accord. *Bostwick* v. *Chapman*, generally referred to as the *Shepaug Voting Trust Cases* (60 Conn. 553; 24 Atl. 32), in 1890 (afterwards followed in New Jersey, *Cone* v. *Russell*, 48 N. J. Eq. 208) held that it was *ipso facto* against public policy to divorce the voting power from the beneficial ownership of stock. It has been followed by the great weight of authority in America (see cases cited by Mr. Smith in 22 Columbia Law Review, at p. 628, footnote 3) and repudiated by a substantial minority of other American authorities cited by Mr. Smith (at p. 629) and by Professor Wormser.

Between these extremes is a middle ground of general concurrence upon which the ultimate decision of this motion will rest. For certain purposes, such as protection of creditors on actual or threatened insolvency, security for loans, execution of a legitimate plan of corporate management specified in the agreement or of a pooling agreement (in jurisdictions where they are valid), and generally where the voting trust is coupled with an interest in the trustees, all jurisdictions sustain the legality of the voting trust. (Compare *Cone* v. *Russell*, 48 N. J. Eq. 208, which holds that in general a voting trust agreement is *ipso facto* void, with *Frost* v. *Carse*, 91 id. 124, which holds a voting trust agreement valid where its stated purpose was " to preserve the identity of those who formed and developed the company, and to protect the stock from purchase by German government agents during the World War.") On the other hand, no voting trust agreement is held valid where its purpose is contrary to accepted public policy. The test is thus stated by Professor Wormser: " The voting trust should not be condemned *per se.* The validity of the trust should be made

dependent upon the purposes for which the trust is created, the powers that are conferred and the propriety of the objects in view."

Mr. Smith states it: "A separation of the voting power of stock from its real or beneficial ownership, irrevocable for a fixed period, is contrary to public policy and void unless: (1) It is coupled with, or to protect, an interest; or (2) made to carry into effect some determined plan or policy to which the voting trustee is bound; or (3) it is merely a pooling contract under which the real owners reserve the right to direct the voting trustee."

Defendants establish at most that a voting trust is legal if it comport with general law and policy, and not otherwise. The vice found in this agreement would invalidate it under these fairly stated rules even in those jurisdictions which independent of statute approve of proper voting trust agreements. It states no determined plan; it is not coupled with an interest; it secures no debt; it is not accessory to a pool, and there is impropriety in its declared object to vest voting power in bank officers.

Moreover, any such agreement must stand or fall upon section 50 of the Stock Corporation Law of 1923 (as amd. by Laws of 1925, chap. 120), passed by chapter 355 of the Laws of 1901 as an amendment to section 20 of the General Corporation Law of 1892. (See, also, Gen. Corp. Law of 1909, § 25.) I have found no decision of any court of this State purporting to decide whether theretofore a valid voting trust agreement could be made. Examination of the leading textbooks of that period discloses that the law was regarded as unsettled and inharmonious. (3 Clark & Marshall Priv. Corp. [1901 ed.] 2019; 2 Cook Corp. [1898 4th ed.] 1186.) The latter author, in describing what we now call a voting trust agreement, says: "Another plan was to place the stock of the various parties in the hands of trustees with power to transfer the stock to themselves, and to hold and vote the same. * * * But this plan failed. The courts held that any holder of a trustee's certificate might at any time demand back his part of the stock."

It is noteworthy that in the 1903 edition of Cook on Corporations, he writes (Vol. 2 [5th ed.], p. 1361): "In 1901 the Legislature of the State of New York declared the public policy of that State, as to the 'pooling' of stock, by enacting a statute," etc.

Professor Wormser places the date of the shift of public opinion in favor of voting trusts in 1905.

Thus in 1901 the Legislature by statute authorized the employment of this voting device which had not yet been approved by the courts of New York and had been disapproved by the large majority of other courts which had considered it. It is a fair inference that the Legislature intended to pre-empt this field of the law and to lay

down the conditions under which alone this novel voting scheme could be used. The agreement, if thus regarded as based on the statute, is invalid for the foregoing reasons which invalidate it *dehors* the statute. The statute is purely permissive. It does not validate a voting trust agreement in other respects against public policy. Compliance with fundamental law and public policy are still essential to such an arrangement. While I find no authority square upon this point, the reasoning in *Manson* v. *Curtis* (223 N. Y. 313, 319) is most persuasive. There stockholders made an agreement, not of formal voting trust, but to unite upon a corporate policy and upon the officers whom they would elect; but they agreed also that a named person was to control the company's conduct and that the directors were substantially to abdicate. COLLIN, J., sustaining squarely the general validity of an agreement among stockholders to continue a stated policy, writes: " Agreements upon a sufficient consideration between them, of such intendment and effect, are valid and binding, if they do not contravene any express charter or statutory provision or contemplate any fraud, oppression or wrong against other stockholders or other illegal object." But he holds the particular agreement void because it contemplated an illegal object in depriving the directors of power actually to manage the corporation.

Similarly here, it is proper under the statute to create a voting trust (a particular binding statutory form of such agreement among stockholders as was referred to by Judge COLLIN), provided it contemplates no " illegal object." The illegality of its object, heretofore outlined, renders it void even if it be viewed as the creation of the statute.

Moreover, there are other features of the agreement which expressly in detail violate the requirements of section 50. Every other stockholder is entitled to become a party to the agreement. Therefore, the agreement may not impose such onerous terms, wholly unrelated to the essentials of a voting trust, as would reasonably deter other stockholders from becoming party to it. If a prohibitive fee were assessed on stockholders as a condition precedent to deposit of stock, there would be substantial denial of the statutory right of all stockholders to join in. This agreement contains provisions essentially as destructive of this right. Stockholders are required to give to the trustees not only voting power, but authority to consent to the merger or consolidation of the bank with any other institution upon any terms they deem fit; to accept in place of the shares deposited any shares in any amount to be issued in exchange therefor on merger and to consent to the dissolution of the bank. Paragraph 10 indeed adds that these

particular powers are not to be deemed exclusive, but that the voting trustees shall be entitled to exercise all powers " as the absolute owners of the deposited stock." A depositing stockholder must not only strip himself of voting power, but, while retaining his beneficial interest, permit these trustees, or their successors, substantially to treat the stock in anyway they wish. The statute compels the voting trustees to procure new certificates with an indorsement that they were issued pursuant to a voting trust agreement, and thus to put upon notice any person who deals with such certificate. This agreement negatives this salutary requirement by permitting the trustees to exchange for certificates not in their own names and so indorsed, but in the name of their nominees. While the stock deposited is stated " to be wholly at the order and under the control of the trustees," they assume no responsibility whatever except for actual misfeasance, yet any trustee may become a director or officer of the bank, receive compensation therefor, or become pecuniarily interested in any transaction with the bank as fully as though he were not a trustee at all. The trustees (paragraph 9) are authorized to transfer a sufficient number of shares of stock to give any person the statutory qualification as a director, provided he is nominated by the trustees, and he must agree at the end of his term forthwith to return to the trustees the qualifying shares so held. This purports to destroy the statutory requirements that a bank director must not only be a stockholder in his own name, but must make oath that he owns the stock in his own right in good faith. For these additional reasons the agreement cannot be sustained under the statute irrespective of the amendment of March 12, 1925. That amendment is also fatal to the validity of this agreement viewed as a statutory voting trust. It provided that section 50 should not apply to banking corporations and it went into effect immediately. While the agreement was dated December 31, 1924, much of the stock was deposited under it subsequent to March 12, 1925. These deposits could not validly be made. I do not lose sight of the saving clauses in the Statutory Construction Law, but as HISCOCK, Ch. J., wrote in *Matter of Wentworth* (230 N. Y. 176, 187): " A repealing statute which preserves rights contemplates definite and substantial ones which are, or are in the nature of, vested property rights and not mere inchoate personal privileges to which in a legal sense one has no indefeasible vested claim."

This voting trust agreement was continuously in process of potential enlargement unless and until all stockholders became party to it. The law required it to preserve that right to all stockholders. Those who deposited under it prior to March 12, 1925,

did so on implied condition that all other stockholders might validly thereafter do likewise. There were no vested property rights fixed prior to March 12, 1925. When the Legislature withdrew banks from the provisions of the act, it necessarily terminated the valid existence of this agreement, both as to those who attempted in violation of the statute to come in thereafter, and as to those who had theretofore come in upon the condition implicit in the agreement that others could continuously and validly come in.

Nor does this conclusion violate the rule of statutory construction against retroactive effect.

" A statute does not operate retrospectively when it is made to apply to future transactions, merely because those transactions have relation to and are founded upon antecedent events." (Opinion of RICHARDSON J., in *Johnson* v. *United States*, 17 Court of Claims [U. S.], 167, 171.)

The amendment of 1925 applied to this agreement as one continuously inchoate and rendered its continuance illegal.

The situation is distinguished from that considered in *Cameron* v. *N. Y. & M. V. W. Co.* (133 N. Y. 336). There, pursuant to a statute, two water works companies had entered into an agreement of consolidation and had called the meetings of stockholders required by statute to ratify the agreement. The statute authorizing the consolidation was then repealed. The court held that under the reservations of the statute the companies had the right to secure the ratification of the agreements which they had in fact made subject to such ratification. There was no question there of permitting other persons to become parties to the agreement after the effectiveness of the statutory prohibition.

Defendants urge that this agreement can be sustained by the substitution as voting trustees of these alternates who are not bank directors or officers. None of these alternates, however, appears to have signed or become party to the agreement. They could become trustees only " in the event of the death, resignation, inability or refusal to act " of the named trustees. It was never contemplated that the word " inability " should be deemed to include this legal inability based upon the fact that the trustees were officers, which was known at the time of the execution of this agreement. The intent of the parties was that the three named voting trustees should act except only as otherwise stated. Nor would this course be permissible under the 1925 amendment as here construed.

Equally untenable is the suggestion that the court should treat this as a genuine trust agreement and under general equity powers designate a trustee to effectuate its purposes. It is not a real trust

agreement of the kind under which equity exercises such function, but a mere voting trust agreement. A signer of this agreement would no doubt view with astonishment the transmission of his voting rights to the nominee of the court. There was never such intention.

Defendants urge that the determination of these questions should be made only on trial and not on motion. There is no substantial question of fact, however. The only serious dispute concerns the allegation that the actions are instigated by persons who are attempting to buy the bank's stock with the ultimate purpose to consolidate it with another bank. This is not germane to the controversy. Any one has the right to buy the stock. If such consolidation should be attempted, there are well-settled remedies in the law to protect minority stockholders. Even proper desire to defeat such a plan cannot justify the creation of an illegal voting trust to officers and directors of the bank. If the views here expressed are correct, the corporate action purported to be taken under this voting trust agreement would result in the greatest confusion and hardship. It is, therefore, in the general interest to continue the injunction. If it is vital immediately to increase the capital of this bank, and beneficial stockholders, to the required amount, wish so to do, such action can readily be taken despite the injunction The *status quo* should, therefore, be preserved.

It should be noted that though the *ex parte* injunction was issued on the original complaint in the action brought by the National Liberty Insurance Company of America, it was stipulated by counsel on argument that the motion before me should be determined on the amended complaint, and the order may recite this stipulation made on argument.

Motion granted. Settle order on notice.