GEORGE U. TOMPERS, Respondent, *v.* THE BANK OF AMERICA and Others, Appellants.

NATIONAL LIBERTY INSURANCE COMPANY OF AMERICA, Respondent, *v.* THE BANK OF AMERICA and Others, Appellants.

First Department, July 6, 1926.

Corporations — stock — voting trust agreement — action to restrain voting of stock under voting trust agreement entered into by stockholders of banking corporation — stockholders of banking corporation had right, prior to amendment of Stock Corporation Law, § 50, by Laws of 1925, chap. 120, to enter into voting trust agreement — said amendment, stating that section should not apply to banking corporation, is not retroactive and did not annul outstanding agreements — General Corporation Law, § 26, does not show public policy against such agreements — voting trust agreements made before amendment may be entered or joined by stockholders after amendment — stockholders have right to protect themselves from change of stock control.

An injunction *pendente lite* will not be granted in an action to restrain the voting of the stock of a bank under the terms of a voting trust agreement, on the ground that the agreement is not authorized by law, for the agreement in question was entered into prior to the amendment of section 50 of the Stock Corporation Law by chapter 120 of the Laws of 1925, and at the time it was entered into there was no law prohibiting stockholders of a bank from making a voting trust agreement under section 50 of the Stock Corporation Law as it then existed.

The amendment, which added a new sentence to the section, as follows, " This section shall not apply to a banking corporation," is not retroactive in effect and will not be construed as annulling all outstanding voting trust agreements entered into by stockholders of a banking corporation.

The provisions of section 26 of the General Corporation Law, to the effect that no officer, clerk, teller or bookkeeper of a banking corporation shall act as proxy

for a stockholder, does not evidence a public policy against a voting trust agreement by stockholders.

A valid voting trust agreement made by stockholders of a banking corporation prior to the amendment of section 50 of the Stock Corporation Law, may be lawfully entered or joined by stockholders of a banking corporation after the amendment became effective, for the amendment merely prohibits the making of voting trust agreements in the future. ·

Stockholders of a banking corporation have the right to protect themselves against a change of stock control by an agreement among themselves.

APPEAL in each of the above-entitled actions by the defendants, The Bank of America and others, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 10th day of April, 1926, granting plaintiff's motion in each action for an injunction *pendente lite.*

· The two appeals, with one or two exceptions, present identical questions, the actions being referred to as the National case and the Tompers case. They were heard together on the complaints and affidavits.

*Charles E. Hughes* of counsel [*Henry Root Stern* and *Bertram F. Shipman* with him on the brief; *Rushmore, Bisbee & Stern,* attorneys], for the appellants.

*Henry L. Sherman* and *Frank H. Stewart* of counsel [*Abel E. Blackmar* and *Louis S. Posner* on the ·brief; *Hirsch, Sherman & Limburg,* attorneys], for the respondents.

· MARTIN, J. This litigation involves the validity of a voting trust agreement. Two actions were brought, one by George U. Tompers and the other by the National Liberty Insurance Company of America, against The Bank of America and others, to enjoin the individual defendants from voting and The Bank of America from permitting to be voted, stock of The Bank of America held by the individual defendants as trustees under the trust agreement which is dated December 31, 1924. This agreement was made for the purpose of protecting The Bank of America against certain interests, asserted to be responsible for these actions, the representatives of which had figured in buying up control of and absorbing a great many banks. When it became known that they were accumulating the stock of The Bank of America, its business and especially that of its trust department became greatly affected.. In this situation, actuated by a spirit of loyalty to the bank and its traditions and desiring to maintain its sound and conservative policies, a large number of stockholders entered into a ten-year voting trust agreement. · At that time such an agreement was expressly authorized by section 50 of the Stock Corporation Law.

It is charged that, taking advantage of a subsequent amendment, those who have instigated these actions to defeat the protective purpose of the trust agreement are at the same time invoking, to serve their purpose, the intervention of equity upon alleged grounds of public policy, on which grounds the injunctions *pendente lite* were granted.

The voting trust agreement provides for the deposit by stockholders of The Bank of America of their stock with trustees and the issuance therefor of trust certificates. Legal title to all shares deposited under the agreement is vested in the trustees, who are given general powers to vote the deposited stock for all purposes whatsoever. As stockholders of record of the corporation and as owners of the legal title, the trustees receive the dividends payable on the deposited stock, but they are required to pay to the depositors amounts equivalent to the dividends on the stock they respectively transferred to the trustees. The trust is to continue for ten years, but it is terminable at the election of the trustees. On its termination, the stock is to be returned to the holders of trust certificates. Any stockholder may become a party to the agreement by depositing his stock thereunder. Two persons are named as successors to each of the original trustees, in the event of death, resignation, inability or refusal to act. Provision is also made for the appointment of successor trustees, to fill vacancies, by the surviving trustees or trustee. The term " trustees " as used in the agreement is therein expressly stated to apply to the original trustees and their successors thereunder from time to time. It is provided that the original agreement shall be lodged with the Bank of New York and Trust Company, as agent of the trustees, a duplicate to be filed in the principal office of The Bank of America, and to be open to inspection by any stockholder daily during business hours.

Section 50 of the Stock Corporation Law, in effect when the agreement was made, sanctioned such an agreement and is as follows:

" Voting trust agreements. A stockholder, by agreement in writing, may transfer his stock to a voting trustee or trustees for the purpose of conferring the right to vote thereon for a period not exceeding ten years upon the terms and conditions therein stated. Every other stockholder may transfer his stock to the same trustee or trustees and thereupon shall be a party to such agreement. The certificates of stock so transferred shall be surrendered and canceled and new certificates therefor issued to such trustee or trustees in which it shall appear that they are issued pursuant to such agreement, and in the entry of such ownership in the proper

books of such corporation that fact shall also be noted, and thereupon such trustee or trustees may vote upon the stock so transferred during the term of such agreement. A duplicate of every such agreement shall be filed in the office of the corporation and at all times during business hours be open to inspection by any stockholder or his attorney."

The statute was enacted in 1901 as section 20 of the General Corporation Law (Laws of 1901, chap. 355), later becoming section 25 of the General Corporation Law (Laws of 1909, chap. 28) and section 50 of the Stock Corporation Law (Laws of 1923, chap. 787). It was amended by chapter 120 of the Laws of 1925 by the addition thereto of one sentence reading as follows: " This section shall not apply to a banking corporation."

The statute in the broadest terms permits voting trust agreements generally. The requirements stated in the section are carefully observed in this instance.

There are no limitations upon the purposes for which such an agreement may be made; nor are any corporations excepted. It is clear that the section does not enumerate the provisions which may be contained in a voting trust agreement. By its terms it was intended to authorize such agreements generally, subject only to the specific provisions referred to and to a definite time limit of ten years.

It is asserted to be against the declared public policy of this State to permit stockholders of a bank, retaining the beneficial interest in their stock, to turn over the voting power, even by a voting trust agreement, to officers and directors of the bank.

The petitioners are asking for the intervention of a court of equity. In doing so they must not overlook the fact that the first principle of equity is justice. It is not only interesting, but desirable to know exactly what is being attempted. Are technicalities being invoked to lead a court of equity to do injustice? Are these *bona fide* actions, to right a wrong, or are parties with an ulterior purpose attempting to use a court of equity to accomplish a questionable result, though professing otherwise?

As the object of these actions and the effect of the injunctions may be to open the way to a competing institution to engulf the defendant bank and its management, or to permit several speculators to embarrass the bank in the accomplishment of their designs, the orders should have at least awaited a trial. The trial may uncover the real object of the actions and it may disclose where the equities really lie.

The authority for the agreement seems to be ample. Every precaution has been taken to comply with the conditions of the

statute. The amendment did not attempt to nullify either directly or indirectly the voting trusts already created. The statute itself indicates the public policy of this State as to the subject involved, and it expresses the limitations which the Legislature deemed necessary to safeguard the interests of the State.

At Special Term (*National Liberty Ins. Co.* v. *Bank of America,* 126 Misc. 753) it was said the agreement is against public policy, reference being made to certain cases, including the *Shepaug Voting Trust Cases* (60 Conn. 553 [1890]) and *Cone* v. *Russell* (48 N. J. Eq. 208 [1891]). When these cases were decided, ideas as to corporations and trusts were radically different from what they are to-day. Many old theories have been discarded. Moreover, in those cases it was found that illegal purposes were covered by the agreements. It is contended for appellants that the courts which disposed of those cases would have decided otherwise if the voting trusts which they considered were necessary for self-preservation and had been intended to accomplish beneficial results.

In this connection it is pointed out that it was said in *Cone* v. *Russell* (*supra*): " This conclusion does not reach so far as to necessarily forbid all pooling or combining of stock, *where the object is to carry out a particular policy with the view to promote the best interests of all the stockholders.* The propriety of the object validates the means and must affirmatively appear."

Similar statements are to be found in the *Shepaug* cases (pp. 564, 565) where it was said: " The trust agreement, so far as Chapman and his associates and the committee are concerned, originated in and had as its prominent factors, secret and improper objects, terms and purposes, which continued down to and entered into the making of this Ripley contract and this traffic contract. Both of these contracts, and any claimed modifications of the Ripley contract, were entered into to carry out such objects and terms and to serve purposes of private and personal profit and advantage to Chapman and his associates and the committee, and not to profit the other stockholders of the Shepaug Company. These contracts are injurious and oppressive to the company and its stockholders, and were entered into by the directors and officers of the Shepaug Company with full knowledge that they were of that character, and would embarrass the company, the shareholders and the trust certificate holders, and injuriously affect their rights and interests in the railroad property."

In *Manson* v. *Curtis* (223 N. Y. 313) the Court of Appeals held that an agreement to insure a course of corporate policy was valid and binding, if it did not contravene any express charter or statutory

provision or contemplate any fraud, oppression or wrong against other stockholders. In that case we find the following: " It is not illegal or against public policy for two or more stockholders owning the majority of the shares of stock to unite upon a course of corporate policy or action, or upon the officers whom they will elect. An ordinary agreement, among a minority in number, but a majority in shares, for the purpose of obtaining control of the corporation by the election of particular persons as directors is not illegal. Shareholders have the right to combine their interests and voting powers to secure such control of the corporation and the adoption of and adhesion by it to a specific policy and course of business. Agreements upon a sufficient consideration between them, of such intendment and effect, are valid and binding, if they do not contravene any express charter or statutory provision or contemplate any fraud, oppression or wrong against other stock-holders or other illegal object. (*Venner* v. *Chicago City Ry. Co.*, 258 Ill. 523; *Thompson* v. *Thompson Carnation Co.*, 279 Ill. 54; *Palmbaum* v. *Magulsky*, 217 Mass. 306; *Winsor* v. *Commonwealth Coal Co.*, 63 Wash. 62.) "

In *Brightman* v. *Bates* (175 Mass. 105, 111) Mr. Justice Holmes, then chief justice of the court, tersely stated the law, as follows:

" We know nothing in the policy of our law to prevent a majority of stockholders from transferring their stock to a trustee with unrestricted power to vote upon it. *Brown* v. *Pacific Mail Steam-ship Co.*, 5 Blatchf. 525, 527. See *Greene* v. *Nash*, 85 Maine, 148.

" Supposing that the committee had been trustees, what would the syndicate agreement have amounted to then? Merely an agreement by each of the trustees to vote as they should jointly agree to vote, and an agreement by the subscribers not to demand back their shares for three years. The latter term certainly is not illegal, whether valid or not. A stockholder has a right to put his shares in trust, whatever his motive. If the trust is an active one he can not terminate it at will, and the attempt to cut himself off by contract, instead of by the imposition of duties, from ending it, certainly is not enough to poison the covenant with the plaintiff. See *Williams* v. *Montgomery*, 148 N. Y. 519, 525. It might be held that the duty of voting incident to the legal title made such a trust an active one in all cases. As to the arrange-ment for the trustees uniting to elect their candidates, the decisions of other States show that such arrangements have been upheld, and we do not think that it needs argument to prove that they are lawful. If stockholders want to make their power felt, they must unite. There is no reason why a majority should not agree to keep together."

A very interesting article on the subject of voting trusts may

be found in the Columbia Law Review (Vol. XVIII [1918], at pp. 123, 136), written by Prof. Wormser. He summarized the law on the subject as follows:

" It is unsound to hold that ' all agreements and devices by which stockholders surrender their voting powers are invalid.' It is unsound to hold that voting trusts are void *per se,* as opposed to good public policy. Such a point of view is surely unprogressive. It ignores business necessities. It disregards economic considerations. It shuts its eyes to business actualities. * * *.

" The correct rule to adopt is to uphold the legality of the voting trust or pooling agreement, provided the propriety and reasonableness of its object affirmatively appear, and provided that the arrangement itself is honest and equitable. The voting trust, in other words, should not be condemned as void *per se,* but should only be condemned in those instances where the trust or pooling agreement is created and carried out in order to effectuate an improper, unjust, or monopolistic object."

The respondent contends that the amendment to section 50 of the Stock Corporation Law being retroactive annulled all outstanding or existing voting trusts of bank stock.

The provision of the statute, as amended, relating to banks is not retroactive; it speaks of the future and does not interfere with a contract which was valid when made.

In *Union Pacific R. R. Co.* v. *Laramie Stock Yards Co.* (231 U. S. 190, 199) Mr. Justice MCKENNA said: " The first rule of construction is that legislation must be considered as addressed to the future, not to the past. The rule is one of obvious justice and prevents the assigning of a quality or effect to acts or conduct which they did not have or did not contemplate when they were performed. The rule has been expressed in varying degrees of strength but always of one import, that a retrospective operation will not be given to a statute which interferes with antecedent rights or by which human action is regulated, unless such be ' the unequivocal and inflexible import of the terms, and the manifest intention of the Legislature.' *United States* v. *Heth,* 3 Cranch, 399, 413; *Reynolds* v. *McArthur,* 2 Pet. 417; *United States* v. *American Sugar Refining Co.,* 202 U. S. 563, 577; *Winfree Admr.* v. *Northern Pac. Railway Co.,* 227 U. S. 296."

In *Jacobus* v. *Colgate* (217 N. Y. 235, 240) the Court of Appeals stated the law as follows: " The general rule is that statutes are to be construed as prospective only (27 Halsbury's Laws of England, p. 159). It takes a clear expression of the legislative purpose to justify a retroactive application * * *."

Section 93 of the General Construction Law reads as follows:

" Effect of repealing statute upon existing rights. The repeal of a statute or part thereof shall not affect or impair any act done, offense committed or right accruing, accrued or acquired, or liability, penalty, forfeiture or punishment incurred prior to the time such repeal takes effect, but the same may be enjoyed, asserted, enforced, prosecuted or inflicted, as fully and to the same extent as if such repeal had not been effected." (See, also, *People ex rel. City of Buffalo* v. *N. Y. C. & H. R. R. R. Co.*, 156 N. Y. 570, 574.)

Legislative debates may be resorted to for the purpose of ascertaining what was intended by the Legislature.

In *People ex rel. Fleming* v. *Dalton* (158 N. Y. 175, 184) the court said on that subject:

" If there was any doubt as to the meaning of the act of 1898, or the intention of the Legislature in passing it, recourse might be had to the records and journals of that body, showing the history of the measure and the debates thereupon for the purpose of ascertaining that meaning and intention. * * *

" The counsel for appellant has submitted, as part of his brief, a copy of the minutes of the debate on the act of 1898 taken by the official stenographer of the Assembly. These minutes disclose that the entire debate proceeded upon the assumption that this act applied to the city of New York, and was brought forward to meet the opinion of the corporation counsel of the city of New York that the provisions of the charter of the city should prevail over the general Civil Service laws of the State."

From this source we have material to show that the amendment to section 50 of the Stock Corporation Law was not intended to affect outstanding voting trusts. In the State Senate not only did some of the members display an unusual interest in endeavoring to have the act affect existing voting trust agreements, but that was the probable motive for this legislation. The debates show conclusively that the act was not to be retroactive and was passed with that understanding.

It is argued that section 26 of the General Corporation Law, to the effect that " No officer, clerk, teller or bookkeeper of a corporation formed under or subject to the Banking Law shall act as proxy for any stockholder at any meeting of any such corporation," evidences a public policy against such an agreement.

The agreement expressly provides that persons other than officers of the bank may be the trustees, clearly meeting the situation, even should it be held that this section of the law referring to proxies is applicable to a voting trust agreement, which contention we do not uphold. If a particular trustee is disqualified or cannot

act, the agreement is not rendered ineffective. This contingency is provided for by naming others to act in such a situation.

With reference to section 26, Cushing on Voting Trusts (p. 124) contains the following statement as the rule governing such cases: " Perhaps the most elusive objection to the enforcibility of voting trusts is that which rests on the theory that such a trust is nothing more than a collective proxy, and revocable as is any proxy. If this theory were correct, the many statutes limiting the effective duration of a proxy would also operate to render totally ineffective a voting trust, for while less than half the States prescibe a limit for the life of a proxy yet that limit varies from seven years to as short a period as thirty days. Those who suggest an analogy between a proxy and a voting trust agreement ignore certain fundamental differences between them. The usual proxy merely establishes a relation of principal and agent terminable by the principal at will either through revocation or through sale of his stock. The voting trust agreement vests in the trustees an interest in the stock which the original owner obviously is unable to nullify by any sale of stock and which he cannot otherwise cancel except through an attempted breach of contract. The holder of a proxy has no control over the stock itself, while the voting trustees have the possession of the stock as well as the legal title to it. The proxy creates a relation of a temporary character under a restrictive statutory authority; the voting trust is created without the need of statutory license and confers not a revocable authority upon an agent but a qualified title upon a transferee of property."

The legislative sanctioning of voting trusts arose nine years after the statute prohibiting officers of banks from acting as proxies. This clearly indicates that the Legislature appreciated the difference and was providing therefor. The distinction between proxies and the power given to trustees by voting trusts is well stated in *Boyer* v. *Nesbitt* (227 Penn. St. 398), where it was said: " In answer it may be said that no question of the right to vote by proxy arises in this case. It seems perfectly clear that the proviso referred to has reference to formal proxies given by a stockholder authorizing the person designated therein to vote his stock at a meeting or at an election. No proxy of any kind was given in the case at bar and therefore the sixty-day limitation has no application. In the present case the persons in whose names the stock stands on the books of the company vote the same as they have the *prima facie* right to do under the express provisions of our statutes."

It is also contended that after the enactment of the amendment to section 50 of the Stock Corporation Law by chapter 120 of the Laws of 1925, providing that " This section shall not apply to a

banking corporation," no one could lawfully join or enter an existing voting trust of bank stock. Said amendment merely prohibits the making of voting trust agreements in the future. It has nothing whatever to do with individual action in relation to existing agreements or with the accrued rights of any one connected with a bank under and by virtue of such pre-existing voting trusts. Their rights were fixed before the amendment was passed and may not be limited or curtailed thereby.

It was stated by the court at Special Term that respondents or their representatives have a right to buy stock if they see fit, and to acquire control of the bank. It may not be amiss to say that those who own the stock of the bank have a right of self-protection against any such threatened invasion. The right of self-protection would seem to be entitled to at least as much consideration from the court in its exercise of equitable jurisdiction as the rights of people who may be endeavoring to speculate or gamble in the bank's stock. It cannot be said now that the equities are not with the appellants.

The orders should be reversed, with ten dollars costs and disbursements, and the injunctions denied, with ten dollars costs.

CLARKE, P. J., DOWLING and WAGNER, JJ., concur.

In each case: Order reversed, with ten dollars costs and disbursements, and motion denied, with ten dollars costs.