15912

JOHNSON *ET AL.* v. SPARTANBURG COUNTY FAIR ASSN. *ET AL.* (McCRAVY *ET AL.*, Intervenors)

(41 S. E. (2d) 599)

58

*Messrs. E. W. Johnson* and *C. E. Daniel,* of Spartanburg, for Appellants, cite:

*Messrs. J. G. Galbraith, R. B. Paslay* and *H. E. DePass,* of Spartanburg, for Respondents, cite:

*Messrs. A. C. DePass* and *George S. DePass,* of Spartanburg, for Intervenor-Respondents, cite:

*Messrs. E. W. Johnson* and *C. E. Daniel,* of Spartanburg, for Appellants, in reply, cite:

February 12, 1947.

OXNER, A. J.: This action was brought by appellants, as minority stockholders of Spartanburg County Fair Association, to enjoin the Association, its officers and directors, from selling all of its assets, except money in the bank and certain securities, for $17,718.12 to Howard McCravy and George S. DePass as trustees for a new fair association to be organized by them, and to have the shares of stock owned by appellants in said corporation appraised under the terms of Section 7706 of the 1942 Code. The proposed purchasers were allowed to intervene and were made parties defendant. All issues were referred to the Master for Spartanburg County who found against appellants. His report was confirmed by the Circuit Court and this appeal followed.

The principal issues to be determined are (1) whether said Association is an eleemosynary corporation, and (2) the validity of the proposed sale of the major portion of its assets. The determination of these questions necessitates a review of the history of the Association and the proceedings at the stockholders' meeting held on March 15, 1946, at which it was sought to authorize the sale of said assets.

The Spartanburg County Fair Association was organized under our statutes relating to the creation of business corporations and its charter issued in 1907 with an authorized capital stock of $10,000.00, divided into 500 shares of the par value of $20.00 each. Only 288 shares were ever issued. The general purpose of the corporation, as stated in its charter, is "to hold an annual fair in the City of Spartanburg in connection with other amusement features". It has since annually, during October, promoted and operated a fair in the City of Spartanburg. The grandstand, bleachers, race track, and numerous buildings for housing exhibits and livestock were constructed on property belonging to the City of Spartanburg which the Association was permitted

to use without payment of rent. The Association permits customary exhibits of needlework, domestic science, agricultural products, and livestock. The principal sources of profit and revenue are derived from paid admissions to the grounds, rents from various concessionaires for space for shows, games and amusements, contracts with carnival companies operating at the fair, and from parking privileges on a lot of 13.6 acres owned by the Association and adjoining the fairgrounds.

The Association has enjoyed a fair degree of financial success. While during some years it was operated at a loss, these losses have been more than offset by earnings in other years. Its best year seems to have been in 1945 when it showed a net profit of $22,500.00. The audit of November, 1945, made after the October fair, shows current assets of $47,-935.74, consisting of cash in bank of $45,425.74 and securities worth $2,510.00. The fixed assets are listed at $17,368-.82, consisting of the thirteen-acre parking lot, valued at $15,852.00, together with buildings on the fairground property, furniture and fixtures, all of which are carried on the books at $1,516.82 after depreciation. The only liabilities disclosed by the audit are a withholding tax of $79.40 and a $9,000.00 mortgage on the parking lot. The audit reflects a surplus of $51,080.63. The bleachers collapsed during the 1945 fair and there are now pending several suits against the Association for the recovery of damages on account of injuries alleged to have been sustained. These contingent liabilities are not referred to in the audit.

No dividend has ever been paid to the stockholders. On December 12, 1916, the stockholders passed the following resolution: "That the meeting go on record as opposed to the payment of a cash dividend, all earnings to go in increased premiums and equipment". On January 1, 1941, the Association entered into a lease with the City of Spartanburg whereby the City, for the nominal sum of $1.00, leased the fairgrounds to the Association for a period of ten years. Under the terms of this lease, the Association agreed to

maintain and keep the buildings and other improvements on the property in good repair and to hold the City harmless on account of any liability resulting from the use of the premises. The lease further provides: "In event lessee should become anything other than a non-profit sharing or elee-mosynary corporation as now carried on, this lease shall be automatically terminated".

Since the Association was organized friction has developed on several occasions among the stockholders. As early as 1921 there was some litigation in which the minority complained of the manner in which the Association was managed and the salaries paid certain officials. Again in 1942 there was further litigation in which the minority claimed that the Association was being improperly managed and operated.

In January, 1946, or shortly prior thereto, a movement was started to organize a new fair association, composed of Spartanburg, Union, Laurens and Cherokee Counties in this State and two counties in North Carolina, to be known as The Piedmont Interstate Fair Association. Considerable publicity was given in the newspapers of the contemplated organization of the new fair. This movement was led by George S. DePass, Esq., a lawyer and farmer of Spartanburg. Mr. DePass testified that the new fair was to be an eleemosynary corporation with no stockholder having the privilege of voting more than 1% of the capital stock.

The by-laws of the Spartanburg County Fair Association provide for an annual meeting of stockholders in December, but none was held in December, 1945, although requested by several of the stockholders and directors. About this time and before such a meeting was called, Mr. DePass, leader of the movement to organize a new fair, began soliciting the following proxy from the stockholders:

"The undersigned stockholder of The Spartanburg County Fair Association hereby appoints D. C. Todd my true and lawful Attorney in my stead, place, and name, with full au-

thority to vote for me as my proxy in favor of liquidating The Spartanburg County Fair Association, at a meeting of the stockholders to be held Friday, March 15, 1946.

"I further authorize him to act as my proxy to vote for and to sign the following option:

"'In consideration of One Hundred ($100.00) Dollars this day received from George S. DePass and Howard McCravy, The Spartanburg County Fair Association does hereby grant a ninety-day option from date to purchase the following assets of The Spartanburg County Fair Association for the sum of Seventeen Thousand Seven Hundred Eighteen and 12/100 Dollars ($17,718.12);

"'1. All of its right, title and interest in and to all contracts of The Spartanburg County Fair Association to be assigned without recourse—$100.00.

"'2. All of its right, title and interest to the parking lot, consisting of thirteen (13) acres, more or less, located on Bishop Street in the City of Spartanburg, and recorded in 10-U-545, and 10-U-543, and also its right, title and interest to the land described and recorded in 5-E-710— $16,-852.00.

"'3. All of its right, title and interest to the lease and good will of the Spartanburg County Fair Association—$1.00.

"'4. All of its right, title and interest to fixtures and all other personal property on the present grounds of the Association—$765.12.

"'This option is given to the said George S. DePass and Howard McCravy in trust nevertheless for the purpose of conveying said option and all rights under same to a new fair association to be organized by them, to be named The Piedmont Interstate Fair Association, or any other name chosen by the directors, as soon as same can be formed, and within ninety days, or else this option to be null and void.'

"I further authorize the said D. C. Todd to act as my proxy to vote for the appointment of the Commercial National Bank of Spartanburg, S. C., as liquidating trustee for

the balance of the assets of The Spartanburg County Fair Association.

"In consideration of a majority of the stockholders of The Spartanburg County Fair Association signing a like proxy, I hereby agree that this proxy shall be non-cancellable."

By January 26, 1946, a majority of the stockholders had executed proxies in the form above set forth. On February 12th a notice was mailed to all stockholders of record of a meeting of the stockholders to be held on March 15th for the purpose of (1) liquidating and dissolving the corporation, (2) considering the granting of the option to Messrs. McCravy and DePass, and (3) appointing a Spartanburg bank as liquidating trustee of the Association. In an effort to secure a two-thirds vote in favor of granting said option, Mr. DePass thereafter continued to solicit other proxies and finally purchased certain shares of stock in the Association, paying from $100.00 to $200.00 per share. Among those signing the proxies was L. G. Traxler, the owner of 28 shares, who executed the proxy on January 21st. Thereafter on March 12th he sold this stock to Edwin W. Johnson, Esq., of the Spartanburg Bar, who was a member of the group of stockholders opposing the granting of the option. There is no evidence showing that Mr. Johnson knew that this proxy was outstanding at the time he agreed to purchase the stock, but we think it reasonably appears that he had knowledge of the proxy prior to the time of the payment of the purchase price. The transfer of this stock to Mr. Johnson was completed on March 13th.

Pursuant to the notice heretofore mentioned, a meeting of the stockholders was held on March 15, 1946. Mr. McCravy, a director and vice-president of the Association, presided. The question immediately arose as to the right of Mr. Johnson to vote the 28 shares of stock purchased from Mr. Traxler which had been transferred to him on the books of the corporation. The chairman of the meeting ruled that the Traxler proxy was irrevocable and that Mr. Johnson had

no right to vote this stock on any of the matters referred to in the proxy. The entire program referred to in the proxy was approved by a vote of 201 shares, or more than two-thirds of the outstanding stock. If Mr. Johnson had been permitted to vote these 28 shares against the program, the number of shares approving same would have been reduced to 173, or less than two-thirds of the outstanding stock. Mr. Johnson, representing the minority interests, thereupon orally protested against the sale of the assets and moved that an appraisal committee be appointed to appraise the value of the stock represented by him and that these share holders be paid the appraised value of their stock. Mr. DePass, representing the majority of the stockholders, stated that the corporation was an eleemosynary one and that no stockholder was entitled to payment for his stock nor in any event would he be entitled to receive more than the original investment of $20.00 per share. The motion of Mr. Johnson was defeated. Later during the meeting a motion was made to elect a new board of directors. This action was opposed by the minority group on the ground that it was not included in the notice of the meeting. The motion was carried and a new board of directors elected. Thereafter on March 18th a meeting of the new board was held, at which a resolution was adopted by a majority of the directors approving the program passed by the stockholders and the officers were directed to execute the option in behalf of the corporation.

This action was thereafter commenced on April 13, 1946. It is alleged in the complaint that the proposed action of the majority of the stockholders would constitute a legal fraud upon the rights of the minority, in that the majority intended to buy the assets at a grossly inadequate price and divert them to a new corporation, staffed and controlled by themselves or their nominees, for the purpose of conducting the same type of fair; that appellants were willing to pay twice the amount named in the option for the assets therein referred to; that the motion to grant the option was not carried by a vote of two-thirds of the stockholders of record as

required by statute; and that if the sale is consummated, a- - pellants are entitled to the appraised value of their stoc-. The relief sought is that the Association, its officers and di- rectors, be enjoined from taking any further steps towa-- disposing of the assets of said corporation or liquidat-- same, and that the stock held by the minority interes- -e appraised and the share holders paid a fair price for their stock. Attached to the complaint is a notice that the plaintiffs would move the Court to appoint three disinterested persons to appraise the value of their stock under the terms of Sectiton 7706 of the Code of 1942.

At the hearing before the Master considerable testimony was taken as to the value of the assets named in the option. There is a sharp conflict in this testimony. That offered by appellants is to the effect that the price stated in the option is grossly inadequate. Several of the appellants testified that they were ready and willing to pay twice the amount offered. According to the testimony of respondents the price named in the option is a reasonable one. There was further testimony by respondents to the effect that the grandstand was in such an unsafe condition that the City would not again permit its use unless repaired or replaced; that the buildings on the fairgrounds were in a bad state of repair; and that the repairs necessary to put the grandstand and buildings in a safe and useable condition would cost approximately $32,-000.00.

It appears that at the time of the reference the organizers of the new corporation had sold approximately $9,000.00 of stock, but after this action was commenced they suspended further efforts to sell stock or to complete the organization. The record does not disclose with exactness how many of the stockholders of the Association have subscribed to stock in the proposed new corporation, but it is conceded that a large number of those who voted in favor of granting the option have subscribed to stock in the proposed Piedmont Interstate Fair Association.

Is the Spartanburg County Fair Association an elee- mosynary coporation?

Sections 8158 to 8168, inclusive, Code of 1942, provide for the organization and incorporation of eleemosynary Corporations. Under the terms of Section 8158, the Secretarty of State is authorized to issue a certificate of incorporation to any company or association, "having no capital stock divided into shares, but holding or desiring to hold property in common for religious, educational, social, fraternal, charitable or eleemosynary purposes other than for the insurance of life, health, accident or property".

In *Sandel v. State,* 126 S. C. 1, 119 S. E. 776, the Court said: "Eleemosynary corporations are those created for charitable and benevolent purposes". It may be doubted whether the General Assembly intended to use the word "eleemosynary" in the foregoing statute only in the sense of denoting a purpose to promote the welfare of mankind by works of charity. It may have been used "in a broader sense to denote an unselfish purpose to advance the common good in any form or manner". *Westchester County Society for Prevention of Cruelty to Animals, Inc. v. Mengel et al.,* Zoning Board of Appeals, 292 N. Y. 121, 54 N. E. (2d) 329. As stated in that case "eleemosynary" is not a word that has "acquired a rigid meaning by judicial construction". We need not, however, pursue this phase of the matter further by undertaking to determine whether the purposes of this Association are such that it could have been incorporated under the foregoing statute, for it is undisputed that it was not so organized or chartered but was organized under the statutes relating to the creation of business corporations. Stock was subscribed, paid for, and stock certificates issued in the ordinary manner relating to business corporations. Nothing in the charter discloses an intent to create an eleemosynary corporation, nor was any effort ever made to amend the charter to effectuate such a purpose.

Respondents assert that the Association was conducted from its inception as a charitable or eleemosynary corpora-

tion and that through long acquiescence in this policy, the stockholders are now estopped to deny its eleemosynary character. The property of the corporation has never been dedicated to an eleemosynary purpose. It is true that no dividends have been paid to the stockholders and that at the meeting on December 12, 1916, the stockholders went "on record as opposed to the payment of a cash dividend, all earnings to go in increased premiums and equipment". But the stockholders have never irrevocably relinquished their right to dividends from the earnings of the corporation. In fact, in the quoted resolution passed in 1916 there was an implied recognition of the right of the stockholders to dividends. While it was decided at that time to adopt a policy of not paying cash dividends, no good reason appears why the stockholders could not have thereafter altered this policy. It is also true that the existing lease on the fairground property provides that it shall terminate in the event the Association becomes a profit sharing corporation, but nowhere in the record does it appear that the stockholders ever agreed with the City that the Association would not thereafter become a profit sharing corporation. The only effect of the stipulation in the lease is to give the right of termination upon breach of the covenant referred to. It must be kept in mind that the contest here is between the stockholders and not between the stockholders or the corporation and a third party who has dealt with the Association on the strength of its being an eleemosynary corporation. It may not be amiss to further point out that the conduct of the majority group of stockholders and their attorney in running up the market value of the stock and purchasing same for as much as ten times its par value just prior to the stockholders meeting of March 15, 1946, is hardly consistent with their present contention that the stock was without value and merely constituted membership in an eleemosynary corporation. As between the stockholders themselves, we find no basis for the claimed estoppel.

In *Salisbury Hospital, Inc. v. Rowan County*, 205 N. C. 8, 169 S. E. 805, it was sought to exempt from taxation as

a "charitable association" a hospital which was organized as a business corporation. It was contended that the hospital was operated not for profit, but solely for charitable purposes. It appeared that charity patients were received without charge. The profits made were used to reduce the indebtedness on the hospital. No dividend was paid to stockholders. "There was evidence tending to show that stockholders of the plaintiff, at the time they subscribed and paid for their stock, did not expect to receive dividends, but there was no evidence tending to show that stockholders had waived their right to dividends, or that plaintiff by corporate action had dedicated its property, real or personal, exclusively to charitable purposes". It was held that the hospital was not exempt from taxation on the theory that it was a charitable association.

Having reached the conclusion that the Association is not an eleemosynary corporation, it follows that any proceedings for the sale of the major portion of its assets or for liquidation must be had under the statutes governing business corporations. Section 7705, Code of 1942, authorizes any corporation, except a railroad corporation, "with the consent of the holders of record of two-thirds of the total number of shares outstanding", to sell and convey "all or substantially all of its property * * *". It is required that such consent of the stockholders be obtained at an annual or special meeting of which notice to each stockholder of record shall be given not less than ten or more than thirty days prior to the date of such meeting. Under the terms of Section 7706, any stockholder voting against the proposed sale and orally demanding at such meeting payment for his shares may within a certain stipulated time apply to the Court for the purpose of having the value of his stock appraised by three appraisers, to be appointed as therein provided, and the corporation is required to pay the value of such stock as fixed by the majority of such appraisers.

Similar statutes have been uniformly construed as giving the holders of two-thirds of the outstanding stock the right to determine the price at which such assets are to be sold and, in the absence of bad faith or fraud, their decision is final. The dissenting stockholder has a plain and adequate remedy-at-law in the appraisal proceedings to secure the fair value of his stock. The only grounds upon which the minority stockholders can maintain an action to enjoin the sale "are that the proceedings are *ultra vires,* illegal, or fraudulent". An excellent review of the authorities on this question will be found in *Wick et al. v. Youngstown Sheet and Tube Co. et al.,* 46 Ohio App. 253, 188 N. E. 514.

Appellants attack the validity of the proposed sale in the instant case upon the grounds (1) that it was not approved by "the holders of record of two-thirds of the total number of shares outstanding", and (2) that it would constitute a fraud on the minority stockholders. These grounds will be discussed in the order stated.

The determination of the first question depends upon whether the Traxler proxy was revocable. It is conceded that if Mr. Johnson, who purchased the twenty-eight shares owned by Traxler and to whom the stock had been transferred on the books of the corporation at the time of the meeting, had been permitted to vote this stock, the proposed sale would not have been approved by the required two-thirds of the number of shares outstanding.

The general rule is that a proxy given by a stockholder to vote his stock at a meeting of stockholders is revocable by him even though the proxy by its terms is expressly made irrevocable. However, there are exceptions when such a proxy or power of attorney is based upon a consideration, or coupled with an interest, and is not contrary to public policy. The rule is stated in Fletcher Cyc. Corp., Perm. Ed., Vol. 5, Sec. 2062, page 187, as follows: "One who has given a proxy or power of attorney to vote

stock owned by him may revoke the same at any time, unless it is coupled with an interest, even though it may in terms be irrevocable. Indeed, according to the weight of authority, an irrevocable proxy or power of attorney to vote stock, if not coupled with an interest, is contrary to public policy".

In so far as the holder of the Traxler proxy is concerned, it was a mere naked power of attorney, not coupled with an interest nor based upon any consideration. Respondents assert that when a majority of the stockholders signed similar proxies, a contract was created between these stockholders, giving each an interest in the stock of the others, which could not be revoked except by unanimous consent. In support of this contention they rely on *Alderman et al. v. Alderman et al.*, 178 S. C. 9, 181 S. E. 897, 105 A. L. R. 102, and other cases in which the courts sustained the validity of certain voting trusts. But these cases are not apposite. The proxies in the instant case do not constitute a voting trust. The distinction between proxies and the power given to trustees by voting trusts is ably discussed in *Tompers v. Bank of America et al.*, 217 App. Div. 691, 217 N. Y. S. 67, where the Court quotes with approval the following from Cushing on Voting Trusts, page 124: "Those who suggest an analogy between a proxy and a voting trust agreement ignore certain fundamental differences between them. The usual proxy merely establishes a relation of principal and agent terminable by the principal at will either through revocation or through sale of his stock. The voting trust agreement vests in the trustees an interest in the stock which the original owner obviously is unable to nullify by any sale of stock and which he cannot otherwise cancel except through an attempted breach of contract. The holder of a proxy has no control over the stock itself, while the voting trustees have the possession of the stock as well as the legal title to it. The proxy creates a relation of a temporary character under a restrictive statutory authority; the voting trust is created without the need of statutory license, and confers, not a revocable authority upon an agent, but a qualified title upon a transferee of property".

If we assume that these proxies constituted an agreement between such stockholders to vote their stock in a specified manner or for a specified purpose, the proxies would be revocable as the agreement would not be supported by any consideration other than the mutual agreements of the stockholders to vote as stated in the proxies. The courts are not in accord as to the validity of such agreements. See annotation in 71 A. L. R., beginning on page 1289. In 13 Am. Jur., page 537, the following conclusion is drawn from the authorities: "Generally it may be said that agreements between corporate stockholders, *made on sufficient consideration,* to unite upon a course of corporate policy or action are valid and binding if they do not contravene any express charter or statutory provisions or contemplate fraud, oppression, or wrong against other stockholders, or other illegal object. Thus, although such agreements are not *per se* invalid, they depend for their validity upon the legitimacy of their purpose". (Italics ours.) But in order for such agreements to be binding on the parties, the authorities are uniformly to the effect that they must be supported by some consideration other than the mutual promises of the several stockholders. *Woodruff v. Dubuque and S. C. R. Co. et al.,* 30 Fed. 91; *Roberts et al. v. Whitson* (Texas) 188 S. W. (2d) 875; *State ex rel Breger et al. v. Rusche et al.* (Ind.) 39 N. E. (2d) 433; *Smith v. San Francisco & N. P. R. Co.,* 115 Cal. 584, 47 P. 582, 35 L. R. A. 309, 56 Am. St. Rep. 119. We quote the following from 13 Am. Jur., page 539: "In a number of instances where an attempt has been made to insure the continued control of the corporation by procuring proxies or powers of attorney to vote the stock, without undertaking to create a trust in the stock itself, the attempt has failed because a proxy or power of attorney, though irrevocable by its terms, is revocable at the pleasure of the owner, at least unless coupled with an interest or *supported by a consideration other than the mutual agreements of the stockholders."* (Italics ours.)

In *Roberts et al. v. Whitson, supra,* there was an agreement between the owners of a majority of the stock in a corporation to vote such stock collectively for a certain period. It was stipulated in the agreement that these stockholders would endeavor to reach an accord in advance of any stockholders' meeting as to voting their stock in a block upon any question presented for decision, but in case of disagreement the matter would be submitted to arbitration. The Court said: "It is obvious, we think, that the parties to the voting agreement were absolute owners of their stock, that neither had any interest in, charge or lien upon the stock of the other, and that the agreement, even if considered permissible, was not based upon any consideration deemed valuable in law".

It is true that as a general rule mutual promises of the parties to a contract are regarded as a sufficient consideration for each other. See *Furman University v. Walker et al.,* 124 S. C. 68, 117 S. E. 356. But such a consideration alone has never been deemed sufficient to make binding an agreement between stockholders to vote in a specified manner at some particular meeting. Even where the soundness of this view has been criticized, the agreement has not been sustained, but deemed invalid as against public policy. See annotation in 56 Am. St. Rep., page 138. We may add that it is not necessary for us to determine whether the alleged agreement in the instant case would have been valid if made upon a sufficient consideration.

The sale by Mr. Traxler of the twenty-eight shares to Mr. Johnson *ipso facto* revoked the proxy which he had previously given to vote said stock. 18 C. J. S., page 1254. The real owner of these shares and in whose name they were registered on the books of the corporation was present at the meeting in controversy and denied the right to vote the stock, and one having no interest whatsoever therein was permitted to vote same against the wishes of the true owner. (The by-laws of the Association did not undertake to fix a date preceding any meeting of the

stockholders as a record date for the determination of those entitled to vote at such meeting). No case has been cited and after diligent search we have been unable to find one sustaining the contention that a proxy of the kind under consideration is irrevocable.

Respondents argue that the proposed sale can and should be sustained as one made by the directors under the power given by Section 7710 of the 1942 Code to directors as trustees upon dissolution of a corporation. The answer to this contention is that these assets were not sold by the directors of the Association pursuant to this section, but respondents endeavored to sell these assets by authority of the stockholders under Section 7705 which, as heretofore pointed out, required the consent of the holders of record of two-thirds of the total number of shares outstanding. Moreover, under the terms of the motion to go into liquidation and dissolve passed at the meeting of the stockholders on March 15, 1946, the corporation was not to be dissolved until December 1, 1947. This motion was not made until after the stockholders had voted to grant the option to Messrs. McCravy and DePass. We think it is reasonable to infer from the minutes of the meeting that the motion for dissolution was contingent upon the validity of the option and upon the optionees' accepting same and complying with its terms. At the directors' meeting which followed three days later, it was merely sought to put into effect the action previously taken by the stockholders by authorizing the proper officers in behalf of the corporation to execute the option which the stockholders had granted.

It follows from the foregoing conclusion that the sale of the assets named in the option has not been approved by the vote of the requisite number of shares outstanding and that appellants are entitled to an order enjoining the Association and its officers from transferring said property or otherwise consummating the sale referred to in the option. There will be no need for an appraisal of the value of the stock of appellants unless a valid

sale is made under Section 7705. We find it unnecessary to consider the contention of the appellants that the proposed sale would constitute a fraud on the minority stockholders.

The judgment of the Court below is reversed and the case is remanded for further proceedings in accordance with the views herein expressed.

BAKER, CJ., FISHBURNE, STUKES and TAYLOR, JJ., concur.